THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* LEONARDO SALEMI, Appellant.

Argued June 9, 1955; decided July 8, 1955.

*Jacob Shientag* and *Rudolph Stand* for appellant. I. James Forlenza was not at the hospital to receive any dying declaration. II. The deceased could not and did not make any dying declaration. III. The defendant was deprived of due process of law under the Federal and State Constitutions in connection with the exhumation proceedings.

*Frank S. Hogan, District Attorney (Charles W. Manning* and *Richard G. Denzer* of counsel), for respondent. I. The motion for reargument of the appeal should be denied. (*People* v. *Patrick,* 182 N. Y. 131; *People* v. *Bonifacio,* 119 App. Div. 719, 190 N. Y. 150.) II. The failure to produce the evidence at the trial — and before the day of judgment — was owing to want of diligence. III. The alleged newly discovered evidence was of a cumulative nature and, as such, could not be a proper basis for a motion for a new trial. IV. The evidence adduced at the hearing, far from probably changing the jury's verdict, would have made it easier for the jury to conclude that defendant was guilty. V. As to the propriety of the exhumation proceedings, defendant could not have been prejudiced by an examination revealing the actual physical facts.

DYE, J. On March 12, 1954, we affirmed by a divided court this defendant's appeal from a judgment of the Court of General Sessions of the County of New York (GOLDSTEIN, J., and a special jury) rendered June 24, 1953, upon a verdict convicting defendant of the crime of murder in the first degree and from an order

of said court made June 17, 1953, following a hearing, denying defendant's motion for a new trial on newly discovered evidence (*People* v. *Salemi,* 306 N. Y. 863). On June 1, 1955, we granted defendant's motion for a reargument of his appeal so that we might review an order of the Court of General Sessions made by Honorable JONAH GOLDSTEIN, following a hearing denying defendant's motion for a new trial on newly discovered evidence (*People* v. *Regan,* 292 N. Y. 109; *People* v. *Dunn,* 298 N. Y. 706; *People* v. *Stein,* 303 N. Y. 627). By this means we are able to test the new matter as if it had originally been a part of the main record. We have done that in this instance.

Briefly, the record shows that at about 8:40 P.M., February 26, 1952, Walter Forlenza was shot and fatally wounded as he sat alone at a table in the dining room of the Belvedere Bar and Grill located at 2056 Second Avenue between 105th and 106th Streets, Borough of Manhattan, New York City; two bullets from a .32 calibre pistol were fired at close range. He died about 9:00 P.M. the following evening, February 27, 1952, while undergoing an emergency operation for the removal of one of the bullets that had lodged near and partially severed the spinal cord. In the confusion following the shooting, the assailant, with a pistol in his right hand, ran out and disappeared. The defendant was suspected and widely sought. Some ten weeks later and on May 14th, accompanied by his counsel, he voluntarily surrendered himself to the District Attorney. Thereafter and on June 19, 1952, the Grand Jury of the County of New York returned an indictment accusing the defendant of the crime of common-law murder. The trial was held in the Court of General Sessions before Honorable JONAH GOLDSTEIN and a special jury commencing November 12, 1952. At the trial the People did not prove motivation but did show that the defendant and his victim for a long period of time had been friends and acquaintances and that there had been "argument" from which the jury could properly infer that defendant had a grievance against decedent. Identification was furnished by two witnesses present at the time and both of whom knew the defendant, one Paul R. (Whitey) Janson, a patron sitting at the bar, positively identified the defendant as the man whom he had seen standing over the deceased with a gun in his hand immediately after the shooting — the other, Andrew Bertorelli, a part owner of the

tavern, placed the defendant in the bar a few minutes earlier. In addition, the People offered as a dying declaration, and it was so received, a conversation had between James Forlenza and the deceased a few hours before he died in which the deceased named the defendant as his assailant. Other witnesses were called to show flight or concealment to account for defendant's disappearance for upwards of ten weeks. The defendant did not take the stand in his own behalf. He relied on his plea of not guilty and his defense of an alibi furnished by witnesses who placed him near a restaurant in Queens at about the time of the shooting. Defense counsel attempted to discredit, on cross-examination, the reliability of the People's witnesses. In an effort to contradict and impeach as a falsity the dying declaration, the defense called Evelyn Forlenza to testify that he had told her he did not know who shot him. On November 20, 1952, the jury rendered a verdict of guilty as charged in the indictment. Prior to sentence which had been set down for December 12, 1952, counsel for the defendant was advised by the court, as had already appeared on the trial, that while the witness Janson was being held in prison as a material witness and two days before he testified at the trial he had rammed his head into the bars of his cell inflicting a severe gash in his scalp requiring eight stitches to close. Thereafter he was lodged in a hotel under guard; that on the evening following the coming in of the verdict Janson had been sent to Bellevue for observation as to his mental condition which was then described as " psychotic ". On December 4, 1952, he was committed to the Pilgrim State Hospital for treatment. The court postponed sentence apparently for the purpose of allowing counsel for the defendant to look into the matter and at the same time advised counsel that the hospital records would be made available to him for use in preparing a formal motion. On March 12th, nearly four months after the verdict, the defendant formally moved to set aside the verdict and for a new trial based on two grounds, first that Janson was mentally incompetent at the time he testified and secondly that new evidence had been discovered supporting defendant's claim of innocence.

The court permitted the case to be reopened for the purpose of receiving evidence bearing on the defendant's contentions. Hearings were held beginning May 19, 1952, at which time the

defendant called a psychiatrist to testify that in his opinion Janson was mentally incompetent at the time he testified. The expert concededly had never personally examined the witness Janson. He based his opinion upon Janson's trial testimony, statements made by him to examiners at the mental hospital as contained in the hospital records, and Janson's self-inflicted injury. The People's expert, Dr. Lichtenstein, who had examined Janson prior to his being called to testify at the new trial, gave as his opinion that Janson was sane at the time of testifying.

At the main trial Janson, who knew both defendant and the deceased and had been present in the Belvedere on the night in question at the time of the shooting, identified the defendant as the assailant. The matter developed by the defense at the new trial hearing to show that Janson at the time he testified was moody and depressed both before and after the suicide attempt, was not new matter at all, but had been before the court and jury on the main trial. The suicide attempt was there brought out and fully explored, at least to the extent that Janson had blown " his top " and had deliberately butted his head against the iron cell bars causing a deep scalp wound requiring several stitches to close. During the course of his cross-examination the suicide episode was adverted to several different times and he was asked whether he had been in a mental hospital or had psychiatric treatment. He even was asked to exhibit his scalp to the jury. In summation, the defense counsel commented on the espisode at length and called Janson " the man that purposely banged his head against the bars ". At the motion hearing Janson was recalled. He had been released from the hospital in custody of his wife sometime preciously. He testified that on July 2, 1952, after a witness, the bartender at the Belvedere had been found strangled to death in First Avenue — he had been locked up as a material witness, for which he was " only too glad ". As the trial date approached, owing to his knowledge of the bartender's fate — he became obsessed by fear and terror as to what might happen if he testified; he said that on November 11, 1952, he " blew his top " and tried to commit suicide by deliberately running his head into the bars. He repeated without material inconsistency, identification testimony given on the main trial. His testimony at the hearing was not shaken by cross-examination. We unanimously agreed that

Judge GOLDSTEIN was right when he ruled that " on both occasions he [Janson] was competent to testify ".

Judge GOLDSTEIN denied the motion for a new trial. Upon the main appeal we reviewed the judgment of conviction rendered on the verdict of guilt and also the order denying defendant's motion for a new trial made at the reopened hearing. At that time the defendant argued that his conviction was not supported by the evidence — the trial issues had turned largely on identity, lack of motive and an alibi — certain trial rulings were urged as erroneous. The adequacy of the jury charge was also questioned.

As to all these points we unanimously agreed that the judgment of conviction was amply sustained beyond any reasonable doubt; that on the record then before us, including both the minutes of the trial and the minutes on the motion for a new trial, the conduct of the trial was free from reversible error in all respects excepting that the dissenting Judges were of the view that " the court's charge did not marshal the evidence as required by *People* v. *O'Dell* (230 N. Y. 481) " (*People* v. *Salemi*, 306 N. Y. 863, 865). On that issue, the court was under no necessity of writing a formal statement of their view to the contrary as the law on that subject is governed by section 420 of the Code of Criminal Procedure which provides: " In charging a jury, the court must state to them, all matters of law which it thinks necessary for their information in giving their verdict; and must, if requested, in addition to what it may deem its duty to say, inform the jury that they are the exclusive judges of all questions of fact ".

While this statute emphasizes that the court shall charge the jury on all matters of law, it does not follow that the charge on the law shall be given with only slight reference to the facts. The better practice for the court in a capital case, as we long ago pointed out, even when uninvited by the defendant to do so, is to present to the jury the case on trial in all its phases in which the jury ought to consider it (*People* v. *Fanning*, 131 N. Y. 659). Here, as in the *O'Dell* case (230 N. Y. 481), we must examine the charge in the setting of the case to determine whether the omission to detail all items of the evidence renders the charge so incomplete as to require a reversal and a new trial. In this case the court charged: " It is the prosecution's contention in

this case that the defendant and the deceased Walter Forlenza knew each other, and that on Tuesday evening, February 26th, 1952 at about 8:30 P.M. in the Belvedere Bar and Grill at 2056 2nd Avenue the deceased Walter Forlenza was sitting at a table in the dining section, and the defendant was allegedly at the bar, and it is claimed that the defendant walked to the table at which the deceased was seated and fired two shots at the deceased at close range. That the defendant immediately fled, and Walter Forlenza was removed to Beth David Hospital where he died the following day from the effects of the bullet wounds.''

The court adverted to the defendant's flight and his alibi by saying:

·'' The prosecution claims that the defendant fled and was not seen or heard from until May 14th, 1952 when in the custody of his lawyer he surrendered himself at the District Attorney's office. It is the defendant's contention that on the night of the shooting he was not in the Belvedere Bar and Grill. It is claimed that he was in a restaurant in Queens County.

'' If you find as a fact that the defendant was not in the Belvedere Bar and Grill when the shooting occurred, then you should acquit him.

'' If you find as a fact that the defendant was in the Belvedere Bar and Grill when the shooting occurred, but that he did not shoot the deceased, then you should acquit him.''

The defendant, we must remember, relied on his plea of '' not guilty '' and his alibi witnesses. Under the proof the court said about all that could be said, for — as we know and as they had been instructed — the statute says: '' The jury * * * are the exclusive judges of all questions of fact ''. The issue was murder in the first degree. The shooting was quickly done. The lone assailant had fled and disappeared and the victim died of the wounds inflicted. What more was necessary to be said? The jury had heard all of the witnesses. We may assume that they had paid attention to the witnesses as they testified and were intelligent enough to remember the various incidental and collateral details without repetition by the court. On the main appeal we regarded the charge in the setting of this case as full and fair. Our view has not changed by our later reconsideration and we adhere to our **former** decision that no error was committed on this aspect of the case.

On that motion the defense also stressed as error the admission of testimony of James Forlenza concerning a dying declaration, for lack of proper foundation and veracity, inadequacy of the charge, etc., all of which Judge GOLDSTEIN carefully reconsidered and adhered to his former rulings. On the main appeal we considered all phases of the controversy concerning the admissibility and credibility of the dying declaration. We unanimously agreed that no error was assignable to that aspect of the case.

We now turn to the within order denying defendant's motion for a new trial based on alleged newly discovered evidence showing that the dying declaration naming the defendant-appellant as the killer was not made at the time claimed and could not have been made at any time because the victim's physical condition was such that he could not talk, a new claim made for the first time on this motion.

The power to grant an order for a new trial on the ground of newly discovered evidence is purely statutory. Such power may be exercised only when the requirements of the statute have been satisfied, the determination of which rests within the sound discretion of the court. So far as pertinent the statute provides, viz. (Code Crim. Pro., § 465):

" § 465. *In what cases granted.* The court in which a trial has been had upon an issue of fact has power to grant a new trial, when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, upon his application, in the following cases. * * *

" 7. Where it is made to appear, by affidavit, that upon another trial, the defendant can produce evidence such as, if before received, would probably have changed the verdict; if such evidence has been discovered since the trial, is not cumulative; and the failure to produce it on the trial was not owing to want of diligence. The court in such cases can, however, compel the personal appearance of the affiants before it for the purposes of their personal examination and cross-examination, under oath, upon the contents of the affidavits which they subscribed."

The test thus enunciated was long ago approved in this court, and since followed — viz.: that " Newly-discovered evidence in order to be sufficient must fulfill all the following

requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence." (*People* v. *Priori*, 164 N. Y. 459, 472; *People* v. *Eng Hing*, 212 N. Y. 373, 392.) On this record these criteria are not satisfied.

At the trial James Forlenza, a brother of the victim was called by the People to testify to a conversation had with the victim shortly before his death, in which he named the defendant as the person who had shot him. This conversation was admitted over objection as a dying declaration. According to the witness' best recollection at the trial, the conversation had taken place between 5:00 and 5:30 P.M. February 27, 1952.[1]

Although it appeared and was readily admitted that, in a prior written statement to the District Attorney, James had fixed the time at 1:00 P.M. and that when he testified before the Grand Jury he had fixed the time at between 4:00 and 4:30 P.M., the defense made no effort to clear up this inconsistency. The cross-examination of this witness was devoted almost entirely to discrediting the statement as a dying declaration on the ground that the declarant was not expecting to die. James was cross-examined to the point of exhaustion on slight inconsist-

---

1. " Q. Will you keep your voice up now, Mr. Forlenza, and tell us exactly what happened as you approached the bedside of your brother? A. When I approached the bedside of my brother I lifted up the flap of the oxygen tent and stuck my head in, bent over him and asked him: 'How do you feel?' He said: 'No good, very bad,' he says: 'I am not going to make it, I am going to die.'

" Q. Did you say anything to him at that time, or did he say anything to you? A. He said to me: 'That is why I sent for you.' So I asked him, he said: 'That is why I sent for you tell you about what you asked me last night.' And I said: 'Who shot you?' He said: 'Nardi.' I said: 'Nardi who?' He said: 'Nardi Salemi, the fellow that I introduced you to.' [Objections by defense overruled.]

" Q. And when your brother said that did you say anything to him? A. No, he kept on talking.

" Q. What else did he say? A. He said: 'I have five thousand dollars out in the street, see that it is collected.'" [Objections by defense that no proper foundation for admission as dying declaration overruled.]

encies in language used on the three different occasions. Everyone, including the defense, proceeded on the theory that such a conversation had, in fact, taken place, the attack being centered at all times on its competency and materiality as a dying declaration, as to which more will be said later.

Returning to the issue as to the time the declaration was made, the defense called *Detective Mengrone*, who visited the hospital four times between 1:00 A.M. and 4:30 P.M. on February 27th, to testify that he saw other relatives of decedent but at no time did he see James either at the hospital or at the bedside.

Notwithstanding the existence of a time discrepancy, defense counsel barely mentioned it in his summation but devoted the greater part of his comment to an attempt to persuade the jury that the defendant was innocent and that the dying declaration was a false, perjurious fabrication.

Counsel for the People, in the course of his summation, pointed out that, in the testimony by James as to the time, the statement was made according to his best recollection; that the inconsistency was explainable by the attendant anxiety incident to the stress and strain of the tragic news plus the utter lack of motive to testify falsely. The question, then, was fully presented to the jury and we must assume that they considered the inconsistency as unsubstantial. Nothwithstanding this state of the record on the main appeal, counsel for the defense now argues that the inconsistency in time raises an issue of fact which should be resubmitted to the jury. At the hearing so-called newly discovered evidence calculated to throw new light on this point was presented. After a careful study of this testimony, we are constrained to conclude that it adds nothing to what was previously before the trial jury. For example:

*Nurse Cancro* said she was there between 4:30 and 5:15 P.M. when the patient was taken to the operating room and during that time had not seen James. However, on her cross-examination she conceded that, when she returned from her lunch hour sometime between 12:30 and 1:00 P.M., she saw two men whom she did not know at the patient's bedside, one of whom had his head inside the oxygen tent. Now it is true that this witness did not testify at the trial. Her name was in the records of the hospital. She married in December, 1952, long after her attendance on the deceased. No one sought to locate her until

1955 — nearly three years after the trial and her marriage — when her married name was not easily discoverable. The point is that the defense did not attempt to locate her at the time of the trial and does not claim to have done so, since it was not then the theory of the defense that the deceased could not talk.

*Dr. Strully,* who between 4:30 and 5:15 P.M. aided in preparing the patient for the operation, testified that no outsiders were present during that time. His name appeared on the hospital chart and was available.

*Patsy Yannotti* was at the bedside for a short while when preparations for the operation were commenced about 4:30 P.M. He left the ward and joined Evelyn and a friend named Donato in the adjacent hallway. During that time he did not see James Forlenza whom he knew.

The moving affidavit alleges that the identity of Yannotti did not become known until sometime in July, 1954. To the extent that the identity of *Cancro* and *Yannotti* were unknown by defense counsel at the time of the trial, I suppose it can be said with some plausibility that the testimony they gave at the hearing was newly discovered in the sense that these witnesses had not been interviewed by the defense counsel prior to the trial. Even if we assume this is so, it does not follow that " the failure to produce [their testimony] on the trial was not owing to want of diligence " (§ 465) for, surely, the names of each one of these witnesses were either mentioned in the hospital records or could have been easily learned by the simplest sort of inquiry. Furthermore, even though we assume that such testimony would have been material to the issues upon which the trial was conducted, it cannot reasonably be said that " if before received " such evidence " would probably have changed the verdict " (§ 465). When these basic ingredients are lacking — and by any standard they are lacking here — the so-called newly discovered evidence does not qualify as the basis for granting a new trial (§ 465).

In reaching this conclusion, we have not limited our consideration of the testimony in accordance with the bare language of the statute but have examined it in the light of the evidence as to this point contained in the record on the main appeal. The issue as to the exact time of the making of the dying declaration as testified to by James Forlenza, as we have seen, was fully

explored at the trial, was adverted to by counsel in summation and its credibility passed upon by the jury. When this alleged newly discovered evidence is viewed against the main record in light of the best inference rule, the most that can be said concerning it is that — at best, it is cumulative or designed merely to impeach or contradict the former evidence. It throws no new light on the issue (*People* v. *Priori*, 164 N. Y. 459, *supra*). The statute requires that to justify granting a new trial it must be shown that the evidence " is not cumulative ". This the appellant is unable to do. It should be mentioned that at the hearing the People met the so-called new evidence by calling several persons who had not testified at the trial.

*Patrolman Snyder,* who testified that, while on duty between 4:00 P.M. and 9:00 P.M., the 27th, he saw two women at the bedside but did not recall seeing any men.

*Patrolman Perrino,* on duty between 8:00 A.M. and 4:00 P.M., who testified that he saw two men at the bedside about 1:30 P.M.

*Jeanne Forlenza,* a sister, who saw James at the hospital at about 4:30 P.M., the 27th.

*Anne Forlenza,* a sister, who saw James at the hospital at about 4:00–4:15 P.M., the 27th.

*Anthony Donato,* a friend of the Forlenza family for many years, that he reached the hospital with Yannotti about 3:00 P.M.; that they looked at Walter, said nothing and remained outside in the corridor until about 3:30 P.M., when they left. They returned about 4:00 P.M. During these times the witness did not see James.

*Maud Forlenza,* wife of James, who testified at the trial, was recalled to testify that her husband, James, was at the bedside about 4:30 P.M., the 27th; that she left him and returned to her place of business where she was joined by James not later than 5:15 P.M.

As to this aspect of the attack on the dying declaration, Judge GOLDSTEIN determined that the time the declarant had made the statement to James was fully explored at the trial and that its credibility was passed upon by the trial jury. He accordingly rejected this aspect of the defendant's motion as a ground for granting a new trial. We cannot now say that, in so ruling, Judge GOLDSTEIN abused his discretion as a matter of law. It seems clear that on this phase of the record nothing was shown

requiring the court to exercise his statutory power any differently than he did.

The defendant's contention that the dying declaration was never made because the decedent could not talk was not raised at the trial for the very good reason that the defense had proceeded on the theory that the testimony of James Forlenza was false and unworthy of belief because, in conversations had with others, the decedent had refused to name his assailant, and that the alleged statement did not qualify as a dying declaration because the declarant had not expected to die, the purpose being — of course — to throw doubt on the credibility of James and the declarant. For this purpose the defense had called *Evelyn* to testify affirmatively that she talked with her husband between 4:00 and 5:30 P.M. on the 27th.[2]

It seems clear beyond dispute that at the trial the defense assumed throughout that Walter could and did talk. At no time was the dying declaration assailed because it was not made due to declarant's inability to talk, but solely on the ground that he had said something else and this at a time when they had the hospital records and autopsy report in court, when the names of Nurses Blanchard and Cancro and Doctors Strully and Breidenbach were known to the defense and whom the defense did not call, although available.

At the motion hearing these persons who had not been trial

2. " Q. Did you talk to your husband? A. Yes.

" Q. And between four and 5:30 did you talk to him? A. Well, he couldn't — Yes, I was talking to him but he was under oxygen and I couldn't talk to him much.

" Q. You couldn't talk too much? A. No, because I would take all the oxygen out of the tent.

" Q. Did you see James Forlenza there between the hours of 4 and 5:30? A. No.

" Q. Did you ask Walter Forlenza who shot him? A. Yes.

" Q. What did he tell you? A. He says he didn't know. He says 'All I was doing was sitting down eating.'

" Q. Did he at any time ever tell you that Salemi shot him? A. No.

" Q. Did you ask him that question constantly? A. I kept asking him to tell me who done it.

" Q. And he always said to you what? A. 'I don't know.' Mr. Fruchtman: That is all. Your witness."

witnesses all testified on the issue of decedent's ability to talk:

*Nurse Blanchard* in charge of the floor and *Nurse Cancro,* special nurse, both testified to the fact that they had no recollection of having heard the decedent say anything at all.

*Dr. Strully* was of the opinion that the patient could not have carried on a conversation as testified to by James. He based this opinion on the circumstance that the decedent had made no reply to his routine inquiries; that based on the hospital report, he believed some teeth were missing but had not verified this by an independent examination as the patient's face, mouth and neck were swollen and that, in his opinion, the patient could not have carried on a conversation as testified to by James.

*Dr. Breidenbach,* that when he saw the patient he found some teeth missing; that the patient's mouth, tongue and neck were badly swollen due to injury from the bullets and that he suspected the jaw had been fractured; that the patient was in a semi-stupor and very weak and that, in his opinion, he was in no condition to have talked, as claimed.

All of this testimony was completely opposed to the theory adopted at the trial and, as such, served only to impeach and contradict former evidence which we have said is not new evidence of the sort warranting the granting of a new trial (*People* v. *Eng Hing,* 212 N. Y. 373, *supra*).

Furthermore, such testimony was all available at the time of the trial but, for reasons best known to the defense, the alleged inability of the decedent to talk was never mentioned.

When the People offered the dying declaration, the defense claimed no surprise which he might have done if he actually believed that decedent could not talk, as now claimed, but he could not do so at that time as the trial strategy was based on the theory that the decedent could have and did talk. To now claim surprise is proposing an afterthought based on a desperate effort to find new grounds for the granting of another trial. Furthermore, defense counsel having failed to convince the jury on the theory that decedent was lying when he named defendant as his assailant, it seems rather late for a new counsel to ask that the case be reopened in order to introduce an entirely new and contradictory theory respecting the validity of the dying declaration. The trial strategy, we must assume, was carefully and deliberately planned. Having failed in its purpose,

we know of no reason for permitting the case to be reopened in order to try out a different and opposing theory.

We must bear in mind that this case has been exhaustively litigated. More than six months intervened between the verdict of guilt and the sentence in order to permit defense to explore the Janson episode and renew many of the contentions made at trial and rejected by both court and jury. Following our affirmance, many other motions were made[3] including two to the

---

3.

| | |
|---|---|
| Motions for reargument of appeal and for an order of recall and amended remittitur denied | April 15, 1954 (306 N. Y. 946) |
| Motion for stay of execution pending determination of petition for writ of certiorari in United States Supreme Court denied | April 23, 1954 (306 N. Y. 978) |
| Execution stayed by Mr. Justice STANLEY REED, Associate Justice of the United States Supreme Court | April 24, 1954 (not reported) |
| Certiorari denied | Oct. 14, 1954 (348 U. S. 845) |
| Rehearing denied | Nov. 22, 1954 (348 U. S. 890) |
| Petition for writ of error *coram nobis* dismissed | December, 1954 (not reported) |
| Certificate granted by DESMOND, J., permitting appeal from dismissal of writ of error *coram nobis* | February 4, 1955 (not reported) |
| Order dismissing petition for writ of error *coram nobis* affirmed, DESMOND and VAN VOORHIS, JJ., dissenting | March 11, 1955 (308 N. Y. 863) |
| Motion granted pursuant to section 503 of the Code of Criminal Procedure, setting week beginning April 18, 1955, for date of the death sentence | March 11, 1955 (308 N. Y. 883) |
| Motions for vacating judgment of death and for a new trial upon ground of newly discovered evidence denied | April 27, 1955 N. Y. L. J., April 28, 1955, p. 8, col. 4 |
| Motion for reopening proceeding and for reargument of motion for new trial granted | May 5, 1955 (not reported) |
| Motion for reargument of application for new trial denied | May 10, 1955 (not reported) |

Supreme Court of the United States, none of which raised any issue as to declarant's ability to speak. There is overwhelming evidence that decedent did speak — and to various persons at various times — for instance:

*Maud Forlenza,* wife of James, and the two sisters, Anne and Jeanne, testified that there was almost a continuous flow of conversation.

*Mary Karasik,* director of nurses, to the effect that Nurse Blanchard had overheard the patient asking his wife how their child was.

*Evelyn Forlenza,* who testified at the main trial for the defense and at the hearing for the People, in each instance to a conversation had with decedent, but which was contradictory, she having testified at the trial that decedent did not state who shot him — while at the hearing she testified that she lied at the trial and that, in fact, the decedent had told her about 11:00 A.M. on February 27th that the defendant had shot him. She said that the deceased had her swear that she would not disclose the information except to his brother, James, and then only in case that he should die.

*Evelyn* explained her recantation on the ground that on the main trial she was literally " scared to death ". Well she might have been. She had just borne a baby out of wedlock, fathered by the victim, Walter. She was familiar with the fact that Walter " had money in the street " which, if collected, would go towards the support of the infant; that decedent had made the statement under a solemn promise that she tell no one but James and then only if he should die; that to be careful of herself and the baby " as something might happen " to them and not to move back to Harlem; that the bartender, Pauitta, who had witnessed the shooting from his unobstructed vantage point behind the bar, met violent death by strangulation shortly after he had testified before the Grand Jury. She knew that, following this tragic coincidence, other witnesses, Bertorelli and Janson were taken into custody as material witnesses and that James had been given a police bodyguard. She knew the ramifications of the narcotic trade and the peril attending a " squealer ". The trial was sensational and it is little wonder that Evelyn chose the easy way out. After all, she was a mother protecting her own in face of stark realities of life as she knew and understood

them. Her recantation as to the contents of the conversation, which at one time even the defense counsel conceded she had with the decedent, was thus fully explained.

Nothing of significance flows from the failure of the People to recall James Forlenza on the hearing. His testimony on the trial had been subjected to a most thorough and exhaustive cross-examination. Nothing remained for him to say.

Perhaps a word should be mentioned concerning another witness named Anthony Donata (or Tony Iodine), a trafficker in narcotics with a long criminal record. He knew both the decedent and the defendant. On the 26th he visited the victim's bedside and, in Italian, asked decedent who had shot him; decedent did not answer but " rolled his eyes toward the officer standing behind the bed "; the following day he returned at about 10:30 A.M.; when Evelyn and Lizzie (Louis Farlradi) stepped out for a moment, he put his head under the tent and again asked the victim who had shot him and was told in a painful way " Nardi " and to tell Albert " to watch out "; that he had no feeling in his legs and that he believed he " could not make it ". Donato left when ordered out by a nurse.

Judge GOLDSTEIN had presided at the trial. He was thoroughly familiar with every aspect of this case. When Doctors Strully and Breidenbach testified with respect to the decedent's physical condition contrary to the autopsy report, factual issues were raised presenting a serious question of weight and credibility. It could only be solved by a re-examination of the decedent's body. It is now contended that this re-examination prejudiced defendant by depriving him of his right to due process, although he consented to the exhumation. This contention is based on the circumstance that the examination was not for the purpose of determining the cause of death, which was already known, but to resolve a collateral matter, condition of the teeth, and whether the wounds were such as to have prevented speech prior to death.

As we view this aspect of the proof, we see no new issue of fact requiring submission to a new jury on the ground of newly discovered evidence. The opinion of Doctors Strully and Breidenbach that the victim was incapable of speech was based on a superficial examination of the outward effects of the injury — since, concededly, they made no otherwise independent examination at the time — relying on statements contained in the hospital

records, the generally weakened condition of the patient and the fact that he said nothing to them. The autopsy report subsequently made showed the true nature of the victim's condition. The missing teeth which had played so prominent a part in their diagnosis were, in fact, not the result of wounds but of a long prior extraction in normal course. While all can say that these witnesses were eminent physicians and honorably disposed, with no reason to testify falsely, they — nonetheless — were mistaken as to the actual damage caused by the bullets and had given their opinions in reliance on facts that were plainly and definitely inaccurate. The re-examination of the body demonstrated this inaccuracy and confirmed the original defense theory that the victim had, in fact, talked to various persons, as testified to on the trial. The medical examiners agreed that the wounds were not of such a nature as to prevent talking prior to death.

It is also contended that Judge GOLDSTEIN conducted the examination and interrogated witnesses not in the presence of counsel for the defendant. To state these objections is to demonstrate their absurdity. The record shows that the examination was attended by a physician of defendant's own choosing, Dr. Birnkrant; that counsel for defendant — and People as well — preferred to stand in the hallway and look through the door rather than be close spectators to the re-examination. A careful stenographic record was made of the proceedings and no one contends that such record was incomplete or inaccurate. It demonstrates that defendant's rights were fully protected. It cannot reasonably be said that Judge GOLDSTEIN in any way prejudiced defendant's rights by asking Dr. Birnkrant from time to time if he saw, understood and agreed with what the operating pathologist, Chief Medical Examiner, Milton Helpern, M. D., was doing and the results found. True, Judge GOLDSTEIN swore the undertaker who had exhumed the body but only for the purpose of identification of the body, a most necessary and essential step in the proceeding. Had the Presiding Judge not done these things — and he was not to be blamed if counsel preferred to remain out of hearing — he would, no doubt, have been charged with another kind of dereliction. In our view, Judge GOLDSTEIN acted with judicial propriety.

When this record is measured with the requirements of the statute, it cannot reasonably be said that the evidence adduced satisfies statute and case law as having been newly discovered, for it is not such as could not have been discovered before the trial by the exercise of due diligence and, even if we assume that it is material to the issue, it nonetheless is cumulative and any purpose it might serve is to impeach or contradict the former evidence; in fact, it cannot reasonably be said that it is of such a nature and quality as would probably change the result of a new trial if granted. As a matter of fact, the evidence adduced at the hearing — far from " probably changing the [jury's] verdict " would have made it easier for the jury to conclude that the defendant was guilty.

Furthermore, the statute contemplates diligence. Here trial counsel acknowledges that he made no investigation concerning the dying declaration until after the Supreme Court denied rehearing on November 22, 1954. The point now raised is clearly an afterthought and is not supported by evidence warranting the granting of a new trial as newly discovered within the meaning of section 465. This is not the situation where the court is depriving the jury of its right to determine an issue of fact, but rather whether the facts are sufficient to warrant setting aside the jury verdict and granting a new trial. We agree with the Court of General Sessions that the alleged newly discovered evidence is insufficient to warrant the granting of a new trial. We are also satisfied that this defendant has been accorded due process in accordance with applicable State law.

The judgment of conviction should be affirmed.

FULD, J. (dissenting). I was one of the bare majority of four who voted to affirm the judgment of conviction when this case was first before us (306 N. Y. 863). Although the record evidence was far from strong, I concluded that there was sufficient to justify a verdict of guilt. The new matter which has been developed and adduced upon the motions for a new trial, as well as upon the application for an order in the nature of a writ of error *coram nobis*, has radically changed the picture, and I cannot now, consistent with the dictates of conscience or the demands of due process, adhere to my original vote of affirmance. A refusal to direct a new trial will not only work

an injustice upon Salemi but, even more important, will do a disservice to the administration of the criminal law.

The conviction against the defendant depended primarily upon the testimony of two witnesses, Paul Janson, who identified defendant as the killer, and James Forlenza, the deceased's brother, who testified that the victim had made a dying declaration to him, naming defendant as his assailant.

As to Janson, proof not before the jury demonstrates that he was probably insane at the time he testified against the defendant, and, as to Forlenza, the newly discovered evidence creates a real doubt as to whether he ever received a dying declaration from his brother. No more need be said about the evidence relating to Janson, for it is indisputable that he was committed as an insane person on the very day after the jury returned its verdict of guilt against defendant.[1] And very little more need be said about the testimony bearing upon the authenticity and existence of the alleged dying declaration. It is enough to observe that, had the new matter been before the jurors at the trial, they would have heard — from witnesses of the highest character, whose honesty and sincerity are beyond all suspicion — not only that Forlenza was not at his brother's bedside in the hospital during the period he said he spoke to the latter and received the declaration, but that, in point of fact, the victim was in no condition, physically or mentally, to have uttered any statement. There was, it is true, conflicting testimony, but the vital thing is that the jury never heard the evidence which, if credited, would have gone far toward destroying the prosecution's case.

In arriving at my decision that there should be a reversal and a new trial, I would not be understood as saying that the defendant is not guilty — I do not know whether he is or not — or that the jury, with the new evidence before it, would have returned a verdict of acquittal. My view is simply that the original jury, or another, could reasonably and conscientiously have reached a verdict contrary to the one that was reported,

1. This material was before the court, in connection with an appeal from an order denying a motion for a new trial, when we originally affirmed the judgment of conviction. However, it did not then have the same impact as it does today when considered with the other evidence brought to our attention by the more recent applications.

on the basis of the matter recently uncovered and not adducible by the defense at the time of the original trial.

The judgment of conviction should, upon this reargument, be reversed and a new trial granted.

DESMOND, J. (dissenting). When defendant was tried, convicted and sentenced to death, all the important proof against him consisted of eyewitness identification testimony by witness Janson, and testimony by James Forlenza of an alleged dying declaration in which the victim is supposed to have named defendant as his slayer. On the trial record as it then stood, and despite the mystery as to motive or background, we held that the jury's guilty verdict was not against the weight of evidence. But, since our affirmance, quantities of new evidence have come to light, the existence and weight of which we must recognize. To my mind, the new proofs insistently demand a new trial for this defendant. In voting for such a new trial this court would not be passing on defendant's guilt nor would we be reviewing again the weight of evidence as to that question. We would be seeing to it that this man does not go to the electric chair until a jury has heard this strange new series of conflicting and confusing narratives, many of them highly favorable to defendant. We would be upholding defendant's fundamental right to a full trial by jury.

Let us assume that the new information, not known at the trial, as to witness Janson's mental condition, does not meet the requirements that new evidence to call for a new trial must be more than merely cumulative or contradicting or impeaching, that it must be such as could not by due diligence have been discovered before the trial and that it must be such as would, if produced at a new trial, probably change the result (Code Crim. Pro., § 465, subd. 7; *People* v. *Priori,* 164 N. Y. 459). Let us go further and assume that the highest court of New York is so tightly bound by that rule that we must close our eyes to everything but the rule. On those two assumptions, even, I still think that a new jury should decide whether or not it is safe to accept the testimony of a witness who went straight from the courtroom to a mental institution, and the seriousness of whose mental illness was certainly not disclosed during the trial to defense counsel. It is unreasonable to charge defense counsel with lack of diligence in discovering the facts as to Janson, facts which

were diligently kept from him by those whose duty it was to disclose all pertinent information about a witness, especially in a first degree murder case. It cannot be stressed too much that Janson was the only witness who identified defendant as the killer.

If the jury had been permitted to learn that Janson was at least temporarily insane during the trial, the jury might have had to rely, for a finding of guilt, on Forlenza's testimony as to a dying declaration. That testimony obviously came as a complete surprise to defense counsel at the trial. To say now that the latter should have stopped the trial and made a prompt and thorough investigation, as to the probability or possibility of that declaration ever having been made at all, is to demand the impossible. Even if a long delay in the trial, for such an investigation, could have been had, how could any lawyer in such a situation have guessed at the existence of testimony which it has since taken months or years to uncover? How could defense counsel have imagined that elaborate investigations later made would turn up two physicians, two nurses, two police officers and several other persons, each prepared to give testimony of greater or less definiteness, completeness and weight, to the effect that the dying declaration could not have been made by decedent or heard by Forlenza? Such testimony is "cumulative" in the broadest sense only of that term since there was no real opportunity or effort to try out the precise question at the trial. For the same reason, it cannot be said to be merely "contradictory". It is brand new evidence to show that an alleged fact surprisingly testified to (not the fact of guilt but the alleged fact of a dying declaration) simply could not be true. To say that all this new material (or any of it) could with due diligence have been produced at the trial by the defense is to ignore reality. How could defense counsel, having no reason to expect dying declaration testimony, have been expected to prepare himself with medical proof that the victim was in fact unable to speak? There simply was no such issue in the case until James Forlenza took the stand. The charge against defense counsel of lack of due diligence is particularly unfounded as to the victim's special nurse Cancro, now a most important witness for defendant, whose very name could not be learned till long after the trial.

The important dispute of fact on a new trial would be as to whether the victim could or did talk. Since at the last trial defense counsel could not have anticipated that any such dispute would arise, diligence in preparing for it is simply not in the picture at all.

This court, since it cannot directly review an order not in the original judgment roll, denying a motion for a new trial on newly discovered evidence, reaches the same result by ordering a reargument (*People* v. *Regan,* 292 N. Y. 109) as we did here. But such a reargument brings up not only the newly discovered evidence, but the whole record, old and new. We cannot, or at least should not, treat the alleged newly found evidence as something separate and off by itself. We should picture the trial record as it would look with the new testimony added. After thus re-examining the total record, our duty is to say whether or not a new jury, hearing all of it, might well come to a different conclusion.

And our power to order a new trial is not limited by the rules as to newly discovered evidence. Having heard a reargument of the entire proceedings, we have now the same powers of disposition and decision as in any other appeal in a capital case. Among those is the power to order a new trial if justice so requires (Code Crim. Pro., § 528). I strongly feel that the interests of justice demand a full trial of this cause before a jury which can hear all the witnesses.

The judgment should be reversed and a new trial ordered.

Conway, Ch. J., Froessel and Burke, JJ., concur with Dye, J.; Fuld, J., dissents in an opinion in which Desmond and Van Voorhis, JJ., concur; Desmond, J., dissents in a separate opinion in which Fuld and Van Voorhis, JJ., concur.

Upon reargument: Judgment of conviction affirmed. And upon such reargument there was presented and necessarily passed upon a question under the Constitution of the United States, viz.: The defendant argued that he was deprived of due process of law under the Fourteenth Amendment of the United States Constitution in respect to the exhumation proceedings by the trial court upon the hearing on the application for a new trial. This court held that the defendant's constitutional rights were not violated.