Gabrielli, J.
A jury found the defendant, John F. Ryan, guilty of having committed the crime of grand larceny (two counts) by false promise under section 155.05 (subds 1, 2, par [d]) of the Penal Law. He was sentenced to serve two concurrent indeterminate terms with a maximum of four and one-half years. The issue presented is whether the prosecution has met its burden of proving the elements of this crime and, more especially, the requirement of the specifically defined *636 intent as limited and mandated by the Penal Law (§ 155.05, subd 2, par [d]).
The defendant was a partner in Ryan & Boyce Inc., a bond brokerage business. He maintained an approved line of credit with Marine Midland Bank on which he would borrow money for his continuing business purposes. Among other transactions, Ryan was engaged in the business of purchasing retain-age bonds to be held in custodial bank accounts for the benefit of contractors performing work under agreements with political subdivisions. Generally the program operated in the following manner. The contractor would enter into an agreement with a school district (or other political subdivision) to perform certain construction work and, to assure completion of the construction, the school district retains the first 10% of the contract price. This retainer could be used to purchase municipal bonds which would earn interest for the benefit of the contractor (see General Municipal Law, § 106), and this is where Ryan would enter the picture. Ryan, using his line of credit with Marine Midland, borrows the funds necessary to purchase the municipal bonds, the purchase being made by Marine Midland at the direction of Ryan, with the bonds to be held by the bank as collateral for the loan. The school district is notified that the bonds were ordered, and is directed to remit the requisite amount to cover the purchase of the bonds. The school district forwards a check payable to the contractor and Ryan, and the contractor endorses the check and sends it to Ryan, who deposits it and repays the loan. When the loan is repaid the bank transfers the bonds from the loan account in which they serve as collateral to a custodial account in the trust department, which custodial account is payable to the contractor upon consent of the school district. In this way the school district maintains control over the retainer and the contractor has the benefit of interest-bearing municipal bonds.
During the course of his business, Ryan had a variety of dealings with the bank. As a result, he had a number of outstanding loans based on unsecured notes as well as loans secured by bonds. This case involves only one of several transactions.
In the instant case Ryan served as the agent for the L. C. Whitford Company, a construction firm which was under contract with the Wellsville Central School District to perform work in connection with a swimming pool project and an elementary school. In the summer of 1972 the contractor *637 arranged with Ryan to buy bonds for the two contracts, approximately $15,000 being required for each contract. Ryan ordered the bonds using his line of credit to borrow the necessary funds under the usual arrangement that the bonds would serve as collateral. The total amount of the loan secured by these bonds was $26,500. In June, the bank notified the school district that Ryan had ordered the bonds and set up the custodial account, and that the school district should forward the appropriate checks. The school district issued a check for $14,917.50 payable jointly to the contractor and Ryan, which was endorsed by the contractor and forwarded to Ryan. On July 10 Ryan deposited it in his checking account, noting on the deposit slip the word "Whitford”, the name of the construction company. On that same day he wrote a check to the bank for $22,000. On July 11, the bank’s trust officer directed the establishment of the custodial account for the Ryan-Whitford transaction. Sometime between July 11 and July 21 the bank manager telephoned the school district to inform it that only one check had been received and two were expected since there were two contracts involved. After further clarification, the district forwarded the second check in the same manner as the first and it was deposited by Ryan on August 1, noting on the deposit slip the words "Wellsville School & Whitford”. On the same day he wrote a check for $5,000 to the bank. Thus, as noted, after depositing each school district check, Ryan had made a payment to the bank, such payments totaling $27,000 or some $500 in excess of the loan secured by the bonds.
In mid-July the bank received $90,000 of municipal bonds which were taken as collateral for an $88,170 loan to Ryan, the loan being used to pay for the purchase of the bonds. Of these bonds, $30,000 worth were part of the Whitford-Ryan transaction, and correspondingly, $26,500 of the loan itself involved this transaction. The collateral loan ledger of the bank indicated that all the bonds were received by the bank and placed in various collateral loan accounts. But there were August 2 notations on the ledger showing that at least $20,000 of municipal bonds were released from collateral and sent to the trust department, and perhaps another $5,000 to $10,000 were also forwarded to the trust department. The defendant argues, and successfully we think, that the only available custodial account into which these bonds could have been placed was the Whitford-Wellsville account.
*638 On August 3, 1972 Ryan notified Whitford by letter that $30,000 of securities had been paid for and delivered to the Wells ville School District. Between August 4 and August 25 the $88,170 note was reduced by payments totaling $61,902.49. In all, from July 10 to August 25 Ryan paid to the bank $101,369.85 of which only $1,900 was applied by the bank to the loan secured by the school district’s bonds. The rest of the payments were applied against another bond loan and a separate note. On October 16, at the request of the school district, the bank’s trust officer wrote to Whitford’s accounting firm verifying that the bank was holding the bonds for the contractor and school district. In addition the internal bank memo establishing the custodial account contained a notation dated October 19 that "[b]onds not to be released”. Such a notation, of course, implies that the bonds were in the account. Later in October the bank manager telephoned the school district to advise it that the bonds were not in the account as indicated and that the prior letter had been a mistake.
During the fall of 1972 Ryan had suffered some business difficulties, leaving his financial status less than secure. The bank was aware of his problems and apparently desired to protect its interests. The bank manager stated that he telephoned Ryan’s office several times but his calls were not returned. Finally, on November 17 the bank terminated his credit and demanded the balance due on the loan secured by the bonds within 10 days. Ryan was unable to make payment and the Whitford bonds serving as security for Ryan’s loan were sold with the proceeds applied to that loan. Eventually Ryan filed in bankruptcy and Whitford filed a complaint with the District Attorney.
The crime of larceny by false promise is defined in section 155.05 of the Penal Law as follows:
"1. A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.
"2. Larceny includes a wrongful taking, obtaining or withholding of another’s property, with the intent prescribed in subdivision one of this section, committed in any of the following ways: * * *
"(d) By false promise.
*639 "A person obtains property by false promise when, pursuant to a scheme to defraud, he obtains property of another by means of a representation, express or implied, that he or a third person will in the future engage in particular conduct, and when he does not intend to engage in such conduct or, as the case may be, does not believe that the third person intends to engage in such conduct.
"In any prosecution for larceny based upon a false promise, the defendant’s intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that such promise was not performed. Such a finding may be based only upon evidence establishing that the facts and circumstances of the case are wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis except that of the defendant’s intention or belief that the promise would not be performed”.
The charge against Ryan of committing larceny by false promise is based on the August 3 letters notifying Whitford that the bonds were in the custodial account. The prosecution contends that at the time the letters were sent, the payment for the bonds had been received, but that the bonds had not been transferred to the custodial account, that the collateral loans had not been paid and that the defendant had no intention of ever completing the deal. The crucial question is whether the facts support a jury finding that on August 3 Ryan never intended to pay the loans and never intended to have the bonds transferred to the collateral account. This issue necessarily involves the question whether the bonds were in fact transferred to the custodial account.
The statute sets forth a high standard of proof for establishment of the defendant’s intent (People v Newman, 80 Misc 2d 975). The facts, as specifically required by the statute, must be "wholly consistent with guilty intent or belief and wholly inconsistent with innocent intent or belief, and excluding to a moral certainty every hypothesis” except an intent not to perform. This special standard was not idly inserted. The Temporary State Commission on Revision of the Penal Law and Criminal Code recognized that the crime of larceny by trick was inadequate to cover numerous frauds of a promissory nature, and consequently "many a swindle in which the culprit’s deceitful intent is crystal clear from the circumstances in their entirety goes unprosecuted or unpunished”. *640 (Third Interim Report, Temporary State Commission on Revision of the Penal Law and Criminal Code, Feb. 1, 1964, p 25.) To cover these situations the crime of larceny by false promise was established but not without qualifications. "The danger of increasing the scope of larceny to cover thefts predicated upon false promises and fraudulent intent is that the crime may reach into the civil realm of mere breach of contract or nonperformance. Though mindful of this peril, the Commission feels that the crime of larceny can be expanded to cover obvious frauds of the indicated nature without opening the door to an avalanche of prosecutions for relatively innocent conduct that does not merit criminal sanctions. Accordingly, the proposed Penal Law does extend the definition of larceny to cover such promissory frauds, but concomitantly limits and qualifies this extension in such fashion that the fraudulent character of a defendant’s promise or intent must be so clearly evident as to render the existence of that element a moral certainty.” (Third Interim Report, p 25.)
The statute has thus created a higher burden of proof of intent because of the close relationship larceny by false promise holds with mere civil wrongs. The standard in the statute equates to the rule used in circumstantial evidence cases (see People v Borrero, 26 NY2d 430, 434-435; People v Bearden, 290 NY 478, 480). We must insist, under this standard, that any inference of intent to be drawn from the facts be reliable (see People v Wachowicz, 22 NY2d 369, 372). The inference of intent must be logically compelling and must exclude any "logical gaps—that is, subjective inferential links based on probabilities of low grade or insufficient degree—which, if undetected, elevate coincidence and, therefore, suspicion into permissible inference” (People v Cleague, 22 NY2d 363, 367). In the context of the crime of larceny by false promise, the inference of intent must overcome to a moral certainty any implication of mere civil wrong. In this case the People have simply failed to sustain that burden.
The defendant had a long relationship with Marine Midland involving a variety of transactions, as well as previous dealings with Whitford. In but one of these transactions, which rose to the fore because of his insolvency, the defendant finds himself accused of perpetrating a scheme to defraud. But the charge can stand only if the high standard of proof of intent was met and we find that it was not.
The prosecution relies on the fact that the bank records *641 indicate that none of the payments made by defendant were credited to the bond loan but the proof of this contention consists only of those records which were kept by the bank. The bank acknowledged that payments were made. The bank officer testified that he did not know what instructions Ryan had given when the payments were made. Nowhere in the record is there any evidence that Ryan instructed the bank to do anything that was improper or illegal. On the other hand, the bank was fully aware of the arrangement involving Ryan, the school district and Whitford, and that the school district checks should have been credited to the bond loan. This awareness was demonstrated by the fact that the bank discovered the school district’s failure to forward two checks as required and specifically requested payment of the second contract retainer bond. Likewise, Ryan deposited each check with a notation reference to the transaction and with each deposit made payments to the bank totaling $27,000. Defendant’s letter of August 3 to the contractor’s accountant certainly does not evidence a false promise in light of the undisputed facts outlined above, but more naturally shows an understandable belief or misguided notion that the bank had in fact applied the funds in the proper manner. Such a belief is, at the very least, reasonable in light of the fact that Ryan and the bank had properly and customarily engaged in these transactions in the manner as indicated.
Although the prosecution contends that the payments were never applied to the bond loan and consequently the bonds were never released to the custodial account, there is evidence to the contrary. The bank collateral loan ledger indicated that on August 2 at least $20,000 of municipal bonds in Ryan’s account were transferred to the trust department where the custodial account was maintained. Additionally, the October 16 letter and the October 19 notation acknowledged that the bonds had been so transferred. Although this letter was later retracted, it indicates that there was internal confusion concerning the accounts of defendant, and the bank could not be sure exactly, and never satisfactorily explained, how the payments were handled.
Thus, it cannot be said with any moral or reliable degree of certainty that on August 3 the defendant did not intend to complete the transaction, or indeed that on that date he did not honestly believe that he had already completed it. Nor can it be said that the bank did not improperly apply some of the *642 payments made by Ryan to the open accounts it held against him, for there is no evidence as to why any of the payments were applied in the manner they were. Under the circumstances of this case we must conclude that the proof has failed to exclude to a moral certainty every hypothesis except a guilty intent (but see People v Rolchigo, 33 AD2d 1060). At most the People have shown that Ryan was a businessman who over extended himself and was consequently unable to meet his financial obligations.
Although not determinative of this appeal in light of our position on the question of adequacy of proof, we note that in this trial involving complex commercial transactions the better practice is to marshal the entire evidence and present the case to the jury in a clear context (CPL 300.10, subd 2; People v Salemi, 309 NY 208, 213). Furthermore, in charging the jury, the court attempted to paraphrase that portion of the statute relating to the specifics of the intent required to convict wherein it is stated that a defendant’s "intention or belief that the promise would not be performed may not be established by or inferred from the fact alone that the promise was not performed”, but he also informed the jury that they could infer intent from the failure of the defendant to carry out his promise, when he told them "a man is presumed to intend the natural consequences of his act”, which cannot be the test under the statute (Penal Law, § 155.05, subd 2, par [d]). We do not find it necessary to reach the other issues raised.
Accordingly, the order of the Appellate Division should be reversed and the indictment dismissed.