■ The People of the State of New York, Appellant, v Jeffrey Santos, Respondent. [761 NYS2d 651] —Order, Supreme Court, New York County (Dorothy Cropper, J.), entered on or

about May 10, 2001, which granted defendant's motion to vacate the judgment of conviction pursuant to CPL 440.10 (1) (g), affirmed.

On his motion pursuant to CPL 440.10 (1) (g), defendant presented newly discovered evidence that, prior to defendant's assault trial, the complainant, a Department of Correction captain, while on staff with the Central Punitive Segregation Unit at Rikers Island, had been charged with assaulting prisoners and falsifying records to conceal those assaults. Furthermore, after defendant's trial, the complainant pleaded guilty in an administrative proceeding to three assaults on inmates.

A motion pursuant to CPL 440.10 (1) (g) is addressed to the discretion of the trial court (see *People v Bryce*, 88 NY2d 124, 128 [1996]; *People v Bedford*, 248 AD2d 245 [1998], *lv denied* 91 NY2d 1005 [1998]). We do not find that the motion court improvidently exercised its discretion in finding that this newly discovered evidence was not merely collateral, as the complainant's history of assaultive behavior went to the very heart of this defendant's trial defense (see *People v Salemi*, 309 NY 208, 216 [1955], *cert denied* 350 US 950 [1956]; *Alvarez v United States*, 808 F Supp 1066 [SD NY 1992]; *contrast People v Reyes*, 255 AD2d 261 [1998], *lv denied* 92 NY2d 1053 [1999]; *see also People v Hudy*, 73 NY2d 40, 57, 56 [1988] [extrinsic proof tending to establish "more than the credibility of the People's witnesses" is "never collateral"]). Nor do we find that the motion court improvidently exercised its discretion in holding that the new evidence "is of such character as to create a probability" that the information concerning the complainant's prior assaultive behavior would have resulted in a more favorable verdict for the defendant (see CPL 440.10 [1] [g]; *People v Salemi*, 309 NY at 216; *People v Marzed*, 161 Misc 2d 309 [1993] [had jury known that police officer had previously lied under oath in another gun case, it is probable that the verdict would have been more favorable to the defense]; *People v Ramos*, 132 Misc 2d 609, 613 [1985] [evidence pertaining to complainant's prior antisocial behavior more than impeachment material as it might well have altered entire "texture and focus" of case]). This is critically so in a case where the prime witness admittedly had assaulted three prison inmates before this trial and whose trial testimony was corroborated by his subordinate; and, further, where credibility was the most significant issue at trial.

In reaching our conclusion to affirm the trial court's exercise of its lawful discretion, we emphasize that the issue on appeal does not only involve a procedural nicety, but beyond that the

issue touches the very essence of a trial's truth finding goal: namely, to accord an accused a full and fair opportunity to present highly relevant evidence in his or her defense. Concur—Lerner, Marlow and Gonzalez, JJ.

Nardelli, J.P., and Tom, J., dissent in a memorandum by Tom, J., as follows: Since I conclude that the information at issue would not likely have changed the outcome of the proceedings, I respectfully disagree with my colleagues and dissent. I would reverse the order on appeal and reinstate the conviction and judgment.

Defendant at the time of these incidents was an inmate at the Manhattan Detention Center. After an altercation with correction officers, he was charged with assault in the second degree. At approximately 3:00 A.M. on December 12, 1997, a doctor in the facility's health clinic saw defendant rummage through a pocketbook owned by a psychiatric social worker. The social worker inspected her purse and found that the contents were in disarray. When questioned, defendant belligerently confronted the owner, demanding "did you see me going through your bag?" A correction officer stepped between defendant and the owner to prevent a further confrontation. This officer contacted Captain Lanza, who brought defendant to a searching cell. No contraband was discovered during the subsequent search, defendant denied having stolen anything, and he was locked in a cell. After interviewing the witnesses, Lanza determined that defendant would only be cited for having been in an unauthorized location. Lanza filled out the necessary paperwork and, pursuant to prison regulations, prepared to serve notice on defendant. Lanza was accompanied by Officer Gonzalez. Lanza and Gonzalez testified that when Lanza entered the cell, defendant became belligerent and screamed "I'm not signing no infraction!" Defendant then punched Lanza in the face. As Lanza hit back, defendant knocked him to the ground, prompting Gonzalez to enter the cell. Gonzalez scuffled with defendant as he and other officers managed to restrain him. Lanza suffered facial injuries including a big welt on his face and a laceration that required eight stitches, and continued to suffer pain in his head and to the face, neck, back and shoulder for over a week. Lanza required treatment at Beekman Hospital including pain medication and physical therapy and was kept out of work for three months. Gonzalez suffered a sprained elbow and injuries to his right hand. Defendant suffered some injuries, including a split lip.

Defendant, testifying in his own behalf, offered a different version of the event. Defendant claimed that he had been

directed by a doctor to wait in the psychiatric social worker's office, so that his presence there was authorized. He denied having gone through her pocketbook. When he was brought to the searching cell, Lanza distracted him by handing him the notice of infraction as Gonzalez punched defendant in the eye. Defendant claimed that several more officers then entered the cell and participated in the beating. During the beating, in defendant's version, Lanza told Gonzalez to hit him, Lanza, in the face, then to hit him harder, with the result that Lanza's face was bloodied. As this occurred, Lanza shouted out "inmate hit me!" On cross, defendant acknowledged that in a statement to the prosecutor about two months prior to trial, he claimed to have been hit 130 times, that he had been waiting in the cell for six or seven hours before being served with infraction papers—which was incorrect—and that he denied there had been inmate witnesses.

Two inmates testified for defendant. Their testimony was in certain respects inconsistent, as to where they were sitting when they observed parts of the incident (one inmate remembered they were at a table, and the other inmate remembered they were in a nearby cell) and what cell number defendant was in. In relevant part, they claimed to have seen Lanza and other officers escort defendant to a cell, after which there was some commotion. One inmate saw Lanza exit the cell shortly afterward with a bloody face; the other inmate saw Lanza step outside the cell and tell another officer to hit him in the face. Notably, defendant testified that this had occurred inside of the cell. One of the inmates testified that he subsequently saw several officers beating defendant. Both inmates, though, also testified that statements they had signed on the day of the incident, indicating that they had not observed any beatings, were false.

Defendant was convicted of assault with respect to Captain Lanza but acquitted as to the interaction with Officer Gonzalez.

Defendant's present CPL 440.10 motion is based on Lanza's conduct while he was assigned to Rikers Island in 1996. The larger context involves a federal class action involving the use of excessive force by correction officers and the filing of falsified reports to conceal abuse and corruption by correction officers. Lanza, for his part, was administratively charged with the use of excessive force and the filing of false reports. In 1999, after the present trial was concluded, Lanza entered an administrative plea agreement regarding incidents at Rikers Island by which he forfeited three vacation days and was required to undergo retraining regarding the proper use of force. Not much

more can be ascertained from the record regarding the underlying administrative charges as they pertained to Lanza himself, as distinct from other officers, or the particular facts to which he pleaded. Even if we accept that this was valid new evidence, in the sense that the plea was subsequent to defendant's trial and conviction and necessarily was unavailable to the defense prior to that time, I do not see how it satisfies the relevant standard for vacatur under the facts and circumstances of this case. A conviction may be vacated on the basis of new evidence only if the new evidence would have probably resulted in a verdict more favorable to the defendant (*People v Taylor*, 246 AD2d 410, 412 [1998], *lv denied* 91 NY2d 978 [1998]). Even if Lanza's credibility might have been rendered more suspect by virtue of the new evidence, which is by no means a foregone conclusion, Gonzalez's testimony clearly and persuasively corroborated that of Lanza. Gonzalez, insofar as we may rely on the record, does not have a disciplinary background that would warrant a challenge to his credibility. Rather, Gonzalez testified before the jury and was subject to the usual mode of cross-examination that would subject his credibility to scrutiny as to the particular events leading to the criminal charges lodged against defendant. Further, defendant admitted that he had no beef with any of the correction officers before this incident. Without any motive to frame defendant, there was simply nothing incredible concerning the testimony of the People's witnesses that defendant was caught in a restricted area rummaging through a social worker's pocketbook, and later lashed out at a correction officer attempting to serve him with a notice of infraction before being subdued. It also appears inconceivable that Captain Lanza would cause self-inflicted facial injuries including a laceration which needed eight stitches, and which required emergency treatment and subsequent therapy, just to frame defendant for no apparent reason. By contrast, the jury obviously discredited defendant's witnesses. It bears noting that their testimony, even as replicated on the cold record, seems compromised by inconsistencies. Moreover, their, and defendant's, prior statements regarding whether they had actually witnessed the events at least raise the issue of fabrication. By noting this, I am not drawing any inference other than the necessary one—that defendant's own case lacks sufficient force, and the prosecution's corroborative evidence is sufficiently compelling, that there is no sound basis to conclude that if the evidence of a minor administrative charge, which resulted in a modest forfeiture of three vacation days and for which no criminal charges were filed, had been before the jury, the result likely would have been more favorable for defendant.