OPINION OF THE COURT
William A. Wetzel, J.
In 1990, the defendant was convicted by a New York county jury of murder in the second degree, attempted murder in the second degree, assault in the first degree, and two counts each of criminal use of a firearm in the first degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. On June 15, 1990, the Honorable Joan Carey sentenced the defendant to 25 years to life on the murder conviction, to run consecutively to concurrent terms of 5 to 15 years on the attempted murder, assault, criminal use of a firearm and second degree possession of weapon convictions, and 21k to 7 years on the third degree weapons conviction. His conviction was subsequently affirmed by the Appellate Division, First Department. (See People v Perez, 221 AD2d 169 [1st Dept 1995], lv denied 87 NY2d 976 [1996].) Approximately 10 years later, the defendant filed his first motion pursuant to CPL 440.10, alleging ineffective assistance of counsel. That motion was denied by written decision and order dated May 21, 2001. The court found that defendant’s trial counsel, privately retained attorney Donald Cameron, had zealously litigated the defendant’s case by filing all of the appropriate pretrial motions and successfully obtaining suppression hearings. At trial, Mr. Cameron conducted thorough cross-examinations of all the People’s witnesses and presented an alibi defense. The defendant also filed a motion for a writ of habeas corpus which was summarily denied by the United States District Court. (Perez v Artuz, 1997 WL 633519, 1997 US Dist LEXIS 15863 [SD NY, Oct. 14, 1997].)
Now, more than 15 years after the Appellate Division affirmed his conviction, the defendant files yet another motion pursuant to CPL 440.10. First, he alleges “newly discovered evidence” pursuant to CPL 440.10 (1) (g), claiming that he has obtained exculpatory evidence, namely, eyewitness testimony of fellow inmates. Second, he again alleges ineffective assistance of counsel, arguing that Mr. Cameron was ineffective because he failed to find these two witnesses. For the reasons which follow, the defendant’s motion is in all respects denied.
*754 Background
To set the defendant’s claim of newly discovered evidence in its appropriate context, it is necessary to briefly set forth the facts adduced at trial.
The People’s trial witnesses were Ramon, Jose, and Orlando Vargas, three independent eyewitnesses, a police ballistics expert, medical professionals, and others. Ramon Vargas testified that at approximately 5:00 a.m. on April 2, 1989, he was seated in a double-parked car on West 139th Street in New York County along with his brothers, Orlando and Jose, and friends Ramon Rivas and Julio Cepeda. Vargas testified that the defendant, who he described as “light-skinned,” along with a “dark-skinned” man, approached their car. (Transcript at 240-241.) Vargas testified that both men had guns. He heard the dark-skinned man ask the defendant, “Are these the ones?” Defendant replied, “Yes.” (Transcript at 243.) Vargas stated that his brother tried to get out of the car to tell the defendant and his accomplice that they were mistaken. (Transcript at 243-244.) Suddenly, shots were fired from two different guns.
Rivas was struck in the head by a bullet which killed him instantly. Vargas was hit by a bullet which lodged in his neck, causing him to become a permanent paraplegic. After the shooting, the “dark-skinned” shooter fled west toward Amsterdam Avenue and the defendant ran east toward Hamilton Avenue. The defendant was subsequently identified in a lineup by both Orlando and Ramon Vargas. Vargas stated that he recognized the defendant “from the block.”
Orlando and Jose Vargas also testified at trial. Their accounts of the events of that evening were very similar to their brother Ramon’s version. Jose Vargas testified that he met the defendant at a wedding approximately one year before the shooting. At the hospital, Jose Vargas told Detective Rosario that “Vidal shot him.” (Transcript at 235.)
Eyewitness Dorothy Robinson testified that, while standing outside of her building on April 2, 1989, she saw a dark-skinned man and a light-skinned man, both holding guns, and standing near a parked car. She observed the dark-skinned man shoot at the car, then flee in the direction of Amsterdam Avenue. She said that the light-skinned man ran in the opposite direction toward Hamilton Avenue. (Transcript at 565.) She estimated that the distance between where she was standing and the parked car was approximately 15 feet. (Transcript at 573.)
*755 Emma Robinson, Dorothy Robinson’s mother, also testified as an eyewitness. She told the jury that, at the time of this incident, she was in her second-floor apartment on West 139th Street. She looked out the window and saw a light-skinned man and a dark-skinned man standing next to a double-parked car. She briefly left her vantage point at the window, but returned when she heard the sound of gunfire. (Transcript at 585.) At that point, she saw the light-skinned man run toward Hamilton Avenue and the dark-skinned man run toward Amsterdam Avenue. During the trial, she identified the light-skinned man as the defendant. (Transcript at 587.)
The third eyewitness, Ulysses Delacruz, testified that he was also in the vicinity of 508 West 139th Street, and, upon hearing gunshots, he looked out onto the street from his apartment window and saw a dark-skinned man running toward Amsterdam Avenue. (Transcript at 490-491.)
The defendant presented an alibi defense. Four witnesses testified on behalf of the defendant, three of whom were the defendant’s friends and the fourth, his girlfriend. By its verdict of guilty, the jury rejected the defendant’s defense.
The Current CPL 440.10 Motion
Defendant now claims newly discovered evidence pursuant to CPL 440.10 (1) (g). Specifically, he supplies affidavits from fellow inmates at Green Haven Correctional Facility, all of whom are convicted murderers. The first, Michael Torres, claims in an affidavit dated April 25, 2006 that, on April 2, 1989, he was in a hallway located at “511 139th Street” with Noel Bonilla, a second affiant. He states that he and Bonilla “were checking the area for some of our regular drug customers,” when he heard gunfire. He claims that he saw one individual, a heavyset male, approximately 6 feet, 5 inches tall, run by him. Torres states unequivocally that the man who ran by him was not the defendant.
Noel Bonilla, in his affidavit dated April 25, 2006, claims that he was with Michael Torres in the early morning of April 2, 1989 and that the two of them were hanging out in the hallway of “one of the buildings.” They were there to sell drugs. Bonilla states that, after hearing gunshots, he ran outside of the building and saw two men running in different directions. Neither one of those men was the defendant, he claims.
Finally, Frank Ogelsby, in his affidavit, states that he was present in the Green Haven library when Michael Torres and *756 the defendant had a conversation about this case. According to Ogelsby, that conversation reflected the version of the shooting attested to by Torres in his affidavit, along with the defendant’s request that Torres testify on his behalf. Ogelsby admits that he has no firsthand information about this case.
The People have interviewed these “new witnesses.” On July 26, 2006, an Assistant District Attorney interviewed Torres at the District Attorney’s Office. When questioned about the heavyset man he saw on April 2, 1989, Torres elaborated on the description of the man and his direction of travel. He stated that the man was a dark-skinned Dominican who fled in the direction of Amsterdam Avenue. (People’s affirmation at 5.)
The People also interviewed Noel Bonilla on August 2 and August 4, 2006. Bonilla said that one of the men was tall, had a dark complexion, and fled toward Amsterdam Avenue. He also said that the other man was shorter and that he could not see the front of his face because it was obscured by cars parked in his line of sight. He said that this man ran in the direction of Hamilton Avenue. Bonilla added that he and Torres smoked marijuana at least three times a day, and he acknowledged that the passage of 17 years negatively affected his memory of the day’s events. He recalled that, back in 1989, shootings in the area were common because those were “the crack days.” (People’s affirmation at 6.)
The People did not interview Ogelsby because “Ogelsby’s affidavit merely repeats a conversation he says he heard and is pure hearsay. His testimony will be inadmissible at any potential retrial and therefore cannot support defendant’s motion for a retrial based on newly discovered evidence.” (People’s affirmation at 6 n 2.)
The second prong of the defendant’s motion is a repetition of his claim of ineffective assistance of counsel. Defendant argues that his trial counsel’s failure to locate, interview, and present the testimony of Torres and Bonilla at trial is new evidence of his ineffectiveness. The two prongs of defendant’s motion will be addressed seriatim.
The “Newly Discovered Evidence” Claim
In order for the defendant to prevail on a claim of newly discovered evidence, he bears the burden of proving, inter alia, that the newly discovered evidence would probably, not merely possibly, change the result upon retrial. (People v Salemi, 309 NY 208, 215-216 [1955]; People v Rodriguez, 193 AD2d 363, 365 *757 [1st Dept 1993]; CPL 440.10 [1] [g].) In applying the Salemi analysis to the facts, it is within the discretion of the court to summarily deny the motion, order a hearing, or to order a new trial. (Salemi at 215; People v Boyd, 256 AD2d 170, 170-171 [1st Dept 1998].) In making this determination, the court must determine “whether the evidence would probably change the result if a retrial were had,” based upon “the veracity of the purported eyewitness.” (Rodriguez at 366.) Conclusory allegations are insufficient to satisfy the defendant’s evidentiary burden or to justify holding a hearing. (People v Session, 34 NY2d 254, 256 [1974]; see also CPL 440.30 [4] [b] [the court may deny a section 440.10 motion without a hearing if such motion is “based upon the existence or occurrence of facts and the moving papers do not contain sworn allegations substantiating or tending to substantiate all the essential facts”].)
Measured against these standards, the Torres and Bonilla affidavits fall woefully short of the legal standard. First, the affidavits are bereft of any allegation whatsoever that either man saw any shooting at all. Both men claim, at bottom, to have heard shots, then to have seen a man or two men running, and they allege that neither of the running men was this defendant. At bottom, both affidavits parrot the same tautology: shots were heard, people were seen running, therefore the running people must have fired the shots, and since none of the running people were this defendant, ergo, defendant could not have been a shooter.
Even assuming, arguendo, that these accounts are even partially accurate and credible, it must be noted that the Torres affidavit is in fact consistent with the People’s case at trial. According to Torres, he heard shots, and then saw a large dark-skinned man run toward Amsterdam Avenue. He states that the dark-skinned man was not the defendant. That version of events is entirely consistent with the testimony of independent eyewitnesses Emma and Dorothy Robinson, and Ulysses Delacruz. The only substantial difference between Torres’ affidavit and the Robinsons’ testimony is that the Robinsons observed more of the actual event than Torres. Dorothy Robinson saw the dark-skinned man actually shoot into the car and then run toward Amsterdam Avenue. Further, she saw a light-skinned man standing near the car with a gun in his hand. After shots were fired, she observed the light-skinned man run toward Hamilton Avenue. Emma Robinson also heard the shots and saw the light-skinned man who she recognized as the defendant *758 run toward Hamilton Avenue, and she also observed the dark-skinned man run toward Amsterdam Avenue. In point of fact, if Torres were to testify at a retrial along with Dorothy and Emma Robinson, his testimony would be corroborative of the Robin-sons, and in fact increase the likelihood of conviction, not decrease it.
Bonilla’s testimony, if provided at a retrial, would be equally supportive of defendant’s guilt. Bonilla’s affidavit simply states that he heard shots, ran outside, saw two men running in opposite directions, and that neither man was the defendant. During his interview with the Assistant District Attorney, “he admitted that one of the fleeing men was dark-skinned and that his direction of travel was toward Amsterdam Avenue.” (People’s affirmation at 8.) This version of events is not only consistent with the testimony of the Robinsons and Ulysses Delacruz, it is nearly identical. Because it supports the People’s theory of the case, it would only add to the overwhelming evidence against the defendant upon retrial. (People’s affirmation at 8.) The only point of disagreement between Bonilla’s affidavit and the People’s eyewitness testimony is his claim that the man who fled toward Hamilton Avenue was not the defendant. However, “he admitted at the interview [with the Assistant District Attorney] that his view of this man was obscured by parked cars and that he could not see the front of his face.” (Id.)
Again, assuming, arguendo, either of these affidavits are credible and/or relevant, one must analyze them in light of the impeachment that Bonilla and Torres would undoubtedly face at trial. Torres and Bonilla are both convicted murderers who are serving life sentences. Bonilla’s record features a long, chronic history of violence and other disciplinary infractions within the prison system. Both men admit that they were near the crime scene because they were dealing drugs in that area. They also admit that they smoked marijuana before and after the events in question. If they were to testify at trial, the inevitable impeachment would focus on their total disregard for the value of human life and the rules of civilized society. Further, the credibility of their observations on that night would be questioned due to their admissions of drug use, and by the lapse of 17 years between the time of these events and the time that they have come forward with these alleged memories.
In summary, suffice to say that if Bonilla and Torres were called as witnesses at a retrial, it is highly unlikely, if not *759 outright incredible, that their testimony would “probably change the result” upon retrial. This conclusion is inescapable when combined with the power of the People’s evidence at trial. In view of the foregoing, the motion to vacate the conviction based on “newly discovered evidence” is in all respects denied.
The Ineffective Assistance of Counsel Claim
For the third time since his conviction, the defendant presses a claim of ineffective assistance of counsel. Since this claim has previously been examined and rejected by every court which has considered it, the defendant attempts to breathe new life into this tired canard by piggybacking it with his newly discovered evidence assertion. He alleges that his attorney’s failure to find, interview, and present at trial the testimony of Michael Torres and Noel Bonilla constitutes ineffective assistance of counsel. This claim is frivolous.
Analysis of an ineffective assistance of counsel claim begins with the well entrenched principle that
“[o]ur state standard for effective assistance of counsel has long been whether the defendant was afforded meaningful representation. In applying this standard, [the Court of Appeals has] emphasized the difference between ineffective representation and losing trial tactics. Indeed, counsel’s performance will not be considered ineffective, even if unsuccessful, as long as it reflects an objectively reasonable and legitimate trial strategy under the circumstances and evidence presented.” (People v Berroa, 99 NY2d 134, 138 [2002] [citations and internal quotation marks omitted]; see also People v Henry, 95 NY2d 563, 565 [2000], habeas corpus granted 409 F3d 48 [2d Cir 2005], cert denied 547 US 1040 [2006].)
Further, “[i]n applying this standard, counsel’s efforts should not be second-guessed with the clarity of hindsight to determine how the defense might have been more effective. The Constitution guarantees the accused a fair trial, not necessarily a perfect one. That a defendant was convicted may have little to do with counsel’s performance, and courts are properly skeptical when disappointed prisoners try their former lawyers on charges of incompetent representation.” (People v Benevento, 91 NY2d 708, 712 [1998] [citations and internal quotation marks omitted]; *760 see also People v Butler, 273 AD2d 613, 615-616 [3d Dept 2000], lv denied 95 NY2d 933 [2000].)
Thus, “[w]here [as here,] the evidence, the law and the circumstances of a particular case, viewed together and as of the time of representation, reveal that meaningful representation was provided, defendant’s constitutional right to the effective assistance of counsel has been satisfied.” (People v Satterfield, 66 NY2d 796, 798-799 [1985].) In this regard, the Court of Appeals “ha[s] clarified ‘meaningful representation’ to include a prejudice component which focuses on the ‘fairness of the process as a whole rather than any particular impact on the outcome of the case.’ ” (People v Henry, 95 NY2d 563, 566 [2000]; see also People v Ozuna, 7 NY3d 913, 915 [2006].) Most importantly, “[t]he benchmark for judging any claim of ineffectiveness must be whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.” (Strickland v Washington, 466 US 668, 686 [1984]; People v Schulz, 4 NY3d 521, 531 [2005].)
Application of the foregoing well established principles to the case at bar leads to the inexorable conclusion that the defendant’s latest ineffective assistance of counsel claim is, as previously stated, frivolous. As a threshold matter, the defendant’s moving papers simply do not contain “sworn allegations [of fact] substantiating or tending to substantiate all the essential facts.” (CPL 440.30 [4] [b].) The defendant’s conclusory, unsupported assertions are insufficient to obtain a hearing on the motion. (See CPL 440.30 [4] [d].) The defendant’s brief asserts, “counsel failed to investigate [if] there had been any more witnesses that could have cleared the petitioner of the crimes charged. Such testimony was crucial in that it tipped the scales of balance toward the petitioner’s case.” (Defendant’s affidavit at 11.) The defendant’s motion is bereft of any specific allegations of what “any more witnesses” would have “cleared” him. It is unclear to this court whether he means additional alibi witnesses, character witnesses, or eyewitnesses. Further, the defendant fails to explain what he believes his attorney should have done to locate these alleged witnesses. These bare-bones assertions are insufficient for the defendant to meet his burden here.
Assuming, arguendo, that the defendant now refers to “newly discovered” witnesses Torres and Bonilla, the motion is denied. As a threshold matter, the defendant’s claim that his attorney, Mr. Cameron, failed to properly investigate is wrong. As the af *761 fidavit filed on August 23, 2006, and attached to the People’s response as exhibit C, makes clear, Mr. Cameron, accompanied by his Spanish-speaking paralegal, went to the neighborhood of the shooting and “spent quite a bit of time on Mr. Perez’s case,” attempting to interview the alibi witnesses, all of whom eventually testified at trial, and any other witnesses who might have relevant evidence. Mr. Cameron specifically states that the defendant gave him the name of a woman who “might have valuable information who lived on the block at which the shooting occurs, and Mr. Cameron interviewed her at her home on more than one occasion, and she testified at trial.” His recollection, however, was that “her testimony was not particularly valuable.” Mr. Cameron also interviewed an investigator who had previously worked on the case. It is apparent to this court, as it has been to every court which has reviewed this claim, that Mr. Cameron diligently investigated and prepared the defendant’s case. As previously determined by the court in a decision and order dated May 21, 2001, Mr. Cameron “zealously litigated” the defendant’s case.
Even if Mr. Cameron had managed to find Torres and Bonilla and convince them to take the witness stand, in all likelihood, his decision to put them on the stand would have been the subject of yet another ineffectiveness claim. As previously discussed, Torres and Bonilla are severely compromised witnesses based on their criminal histories, as well as the fact that by their own admission they were only at the scene because they were selling drugs. Their ability to perceive events was compromised by ongoing marijuana use. As if this were not enough, as discussed earlier, their testimony, if it comported with their affidavits, would basically be corroborative of the People’s case. Both admit that neither saw the actual shooting. Their only contribution is to say that, after hearing gunshots, they saw two men running, neither of which they believed to be the defendant. Such testimony, if it would affect the jury at all, would certainly not rise to a level of credibility and relevance to change the outcome of the trial. Therefore, for the fourth time, defendant’s assertion of Mr. Cameron’s ineffectiveness is rejected.
In view of the foregoing, the defendant’s motion is in all respects denied.