OPINION OF THE COURT
Joseph A. Zayas, J.
The defendant moves pursuant to Criminal Procedure Law § 440.10 (1) (g) and (h) to vacate the judgment, rendered March 3, 2003, convicting defendant of attempted sexual abuse in the second degree and attempted endangering the welfare of a child. Defendant was convicted of attempting to sexually abuse her then 11-year-old son, A.R.,[1] in her Queens apartment sometime between September 1 and November 30, 1998. In her motion, defendant argues that vacatur is warranted, not because of judicial error or prosecutorial misconduct, but based upon newly discovered evidence — A.R.’s complete recantation of his trial testimony, as reflected in his sworn affidavit, as well as the sworn affidavit of defendant’s younger son, M.R.
On September 15, 2010, the court granted defendant’s motion only to the extent of ordering a hearing (see CPL 440.30 [5]). At the recantation hearing, A.R. and M.R. testified on behalf of their mother, defendant Bronson; and Maryann Howard, a retired social worker who investigated the original sex abuse allegations in 2000, testified on behalf of the People.
The court, having reviewed the trial transcript and having observed the demeanor of A.R. and M.R. during their hearing testimony, now finds that A.R.’s complete recantation of his trial testimony — his remorseful admission that as a troubled adolescent he, “prodded” by his stepmother and father, falsely accused his mother of sex abuse and then repeated that fabricated accusation under oath at his mother’s trial to curry favor with his father — was inherently believable and credible. Because A.R.’s credible recantation clearly constitutes newly discovered evidence and unquestionably “create[s] a probability that had such evidence been received at the trial the verdict would have *203 been more favorable to the defendant,” the motion to vacate the judgment of conviction is granted pursuant to CPL 440.10 (D (g).
The Original Charges, Trial and Conviction
Defendant was charged, in a superceding information dated January 10, 2001, with one count of sexual abuse in the second degree (Penal Law § 130.60) and one count of endangering the welfare of a child (Penal Law § 260.10). The deponent, R.R. (defendant’s former husband), alleged that he was informed by his son, A.R., that defendant Bronson “did fondle his penis with her hand” sometime between September 1 and November 30, 1998, when A.R. was only 11 years old. The People reduced the charges to attempted sexual abuse in the second degree and attempted endangering the welfare of a child prior to trial.
The bench trial commenced in January 2002.[2] At trial, A.R. testified that sometime between September 1 and November 30, 1998, when he was 11 years old, his mother “would come into [his] bed” at night and “touch [his] penis” with her “hand.” A.R. did not “know” “how long approximately in one given evening . . . this last[ed]” because he “didn’t really keep track of it.” He testified that these incidents took place “maybe once or twice” a week, “just for a few months.”
Although A.R. had been living with his mother from the time that his parents separated when he was four years old, he began living with his father and stepmother in Connecticut in January 1999, just two months after his parents’ divorce. Several weeks after moving in with his father, his stepmother began asking him “what it was like living” with his mother. When A.R. “said it was really bad,” the stepmother “asked [him] to go and get into detail about it” and he told the stepmother what happened. Although this disclosure occurred in February or March 1999, defendant was not arrested until 15 months later (May 25, 2000), after A.R. was placed into the custody of the Connecticut Department of Children and Family Services (CDCFS) by his father because A.R. was having various difficulties living in his father’s home (e.g. A.R. had set a fire in .the backyard, engaged in acts of self-mutilation, and threatened his father and brother with a knife). A.R. also had “emotional difficulties” and “quite elevated” “outbursts,” prior to moving in with his father, all of *204 which caused defendant to bring A.R. to a psychologist in October 1998, and to a hospital soon thereafter.
In April 2000, Maryann Howard, a social worker for the CD-CFS, was assigned to investigate A.R.’s sex abuse allegations. Ms. Howard testified that when she asked defendant whether “she recalled any occasion when she would have touched her son in an inappropriate manner,” defendant “recalled ... an occasion when she awakened in her bed and [A.R.] was over her . . . [a]nd she reached down with her hand and touched his genitals.” Defendant later acknowledged her statement to Ms. Howard during her own testimony, explaining that when A.R. fell asleep with his head on her shoulder and his arms across her chest, she attempted to roll him away when she accidentally touched his genitals.
Defendant denied ever having improper sexual contact with either of her sons. At the time of trial, defendant was a faculty member of Ballet Hispánico and a full-time honors student at Southern Connecticut State University. She testified that although her divorce became final in November 1998, “there was great difficulty collecting the child support and maintenance” and there was “a lot of intimidation in regard to the money issues,” which “created a very, very difficult and distressing atmosphere.” Defendant agreed to a change of custody in January 1999 because “emotionally it was very draining and upsetting . . . to be dealing with [R.R.’s] threats and intimidation, receiving payments late, not knowing if they would come.”
At trial, defendant called three character witnesses, each of whom testified to defendant’s good character and reputation for truthfulness.
Defendant was ultimately convicted of attempted sexual abuse in the second degree and attempted endangering the welfare of a child on February 22, 2002.® On March [3], 2003, the court imposed a sentence of one year of probation and adjudicated defendant a level one sex offender.3 [4]
*205 The Motion to Vacate and the Recantation Hearing
Seven years after defendant’s conviction, defendant moved pursuant to CPL 440.10 (1) (g) and (h) to vacate the judgment of conviction. In her motion, which the People oppose, defendant argues that vacatur is warranted based upon newly discovered evidence — A.R.’s current claim that his mother never sexually abused him and his complete recantation of his trial testimony.
On September 15, 2010, this court granted defendant’s motion only to the extent of ordering a hearing (see CPL 440.30 [5]), which was later held on January 10 and April 1, 2011. At the recantation hearing, A.R. and M.R. testified on behalf of their mother, defendant Bronson; and Maryann Howard, a retired social worker who investigated the original sex abuse allegations in 2000, testified on behalf of the People.
A.R., now 23 years old, testified that defendant, his mother, never “touch[ed] [him] in a sexually inappropriate way” and that his prior statements and trial testimony regarding the abuse were “false.” He testified that he made up the allegations one year after moving in with his father (around March 2000) after his stepmother and father “probed” and “prodded” him to disclose negative information about his mother — to the point where it appeared to A.R. that they were “looking for something” of which to accuse her.
A.R. testified that he fabricated the “false allegation” regarding sex abuse for two reasons. First, he made the false allegation to “take the attention off [him]self,” and to otherwise attempt to “just kind of be under the radar” since he was having difficulty following the household rules and was causing a lot of trouble at home (e.g. he had set a fire in the backyard and had threatened his father and brother with a knife), having just been allowed to return home after living in a Connecticut youth shelter for several months. Second, he made the false allegation to curry favor with his father, who had been consistently complaining to A.R. that his mother was “out to get him,” had “ulterior motives,” was causing him great “hardship,” and was “costing him money” by always dragging him to court regarding the divorce proceedings. A.R. explained that by making the false allegation, he believed that his father would be pleased with him because his mother “would have a charge against her, and that would be consuming all of her time and energy” and she would not “have any available resources to continue to take [his] father to court.” After A.R. made these false allegations, *206 he was again promptly placed at various treatment residences through the CDCFS.
A.R. further testified that almost two years after making these initial allegations, he returned to his father’s home in Vermont and later repeated the false allegations when he testified at his mother’s trial. A.R. explained that he testified falsely “because at that point [he] felt like [he] had carried this lie so far that [he] needed to see it through because [he] didn’t want [his] dad to see [him] as a liar or [as] disloyal to him” or “as a traitor.” A.R. “knew” that providing false testimony “was wrong,” but decided to provide such testimony “just to benefit [his] family and [his] dad in particular.” A.R. testified that he was always “trying to maintain [his] relationship with [his] father and stay living with him.” Within a month or two following his false testimony against his mother, however, he was again removed from his father’s home and placed “into foster care in Vermont.”
When the court asked A.R., why he was so “willing to bring . . . false charges” against his mother and whether he “consider [ed] how that would affect her life” at the time, A.R. explained:
“Because my dad had such a hard time with my mom. Because I felt like I was almost a part of his life, his side of it all. Like I definitely took his side in all issues that he would tell us about regarding my mom taking him to court. Taking more money from him. And being so naive like everything [my father] said we absorbed as truth when it came down to it. As we got older, I think I already had in my head a set side I was on. . . . And I wanted to stay with my dad. I am sure I was influenced by, you know, leniency in the past through visits. But at the same time when we were living there ... I always felt I was still on his side. . . . So I just never found fault in the things that my dad did. ... I was being very selfish and close-minded, and I did not consider [my mother’s] feelings or the implications that it would have on her life down the road. I was mainly focused on helping my dad to ease his financial burden regarding the court cases, as well as keep him out of court, so he could do the work that he loved, which was photography.”
A.R. testified that he was “very happy” when he moved out of his mother’s Queens apartment and moved to the suburbs to live with his father in Connecticut in January 1999. He *207 explained that he yearned for a “normal family life” “where everyone kind of eats dinner together,” and felt that his father’s home would provide that type of life, even though his father appeared intoxicated almost every day when A.R. lived with him. He “always looked up to” his father and viewed him as a “great role model,” despite his alcoholism. A.R. testified that his father was “a freelance photographer who was very renowned in his line of work,” and that “being important in [his] father’s eyes was one of [his] greatest motivators for doing anything.” His father, R.R., ultimately died of alcohol-related causes in October of 2007.
When A.R., who is now married and employed at a public access television station in Bennington, Vermont, was asked, “why are you coming forward today,” he answered:
“Because this is a horrible thing that I did to my mother. And it’s something that for me to really go forward with my life, I need to at least know that I tried to have it reversed because I know in my heart where the truth is. And that is why I am here today ... to make the truth known for me and my family. I feel like it is necessary.”
A.R.’s quest to “make the truth known” began when his brother, M.R., visited him in March 2007. During that meeting, M.R. was talking about the economic “hardship” defendant, a teacher, was experiencing as a result of the sex abuse conviction, which required her to maintain her sex offender registration. A.R. testified that during that conversation, M.R.’s words “really stuck with [him] . . . how badly it was affecting [his mother’s] life.” He then “tried to let [M.R.] know like, Hey, man. I don’t know what you know, what you don’t know, but I am telling you right now that that wasn’t true. That didn’t happen.” He told M.R. to “let mom know . . . [he was] willing to kind of move forward to get this stuff taken care of.”
Although A.R. knew that “this is something [he] ha[d] to do,” he was “still processing it [him]self ’ in 2007 because it was “going to be embarrassing” and he “was worried [he] was going to go to jail,” that “charges would be brought against” him, and that “it would affect [his] job [and] his family.” His “main fear” was a “perjury” prosecution. He explained that “as much as [he] wanted ... to recant the false allegations, [he] needed to have all the information laid before [him] before [he] was able to fully commit to it,” which took over one year. A.R. then retained private counsel who reached out to defendant’s lawyer.
*208 A.R.’s brother, M.R., also testified and corroborated A.R.’s testimony that in March 2007, M.R. began to talk to his brother about how the sex abuse conviction “was negatively affecting [their] mother, . . . emotionally and financially,” especially since their mother could not work as a teacher with such a conviction. During that conversation, A.R. told M.R. “that the allegations that he made were false, and that he was never sexually abused by [their] mother.” M.R. shared with his brother that he “had this feeling deep inside of [him]self that the allegations weren’t true,” because he knew that his mother “would never do anything to hurt us.” A.R. and M.R., who was living with his mother in Connecticut at the time, then “talked about what could be done . . . to fix things right. To bring forth the truth.”
M.R. further testified that he shared the bedroom with his brother when they lived with their mother in Queens and that he never observed his “mother get into [A.R.’s] bed at night” or “engage in any kind of sexual contact with A.R.” M.R., now 21 years old, candidly admitted that when he was a child he wrote and said many negative things to various professionals about his mother, including a statement that his mother “locked [A.R.] in his bedroom for three weeks”; a statement that he could not “stand to see [his] mother or be with [his] mother knowing what she did to [A.R.] or knowing that she . . . sexually abused [A.R.]”; a statement that his mother “smeared snot all over his face”; a statement that his mother “would sit on [A.R.], bear hug him, so he would not move”; and a statement to his mother that his “friend[s] do not sleep with [their] moms because it is weird, but you thought it was all right. I am sick of your lies.”
M.R., who now works for a news Web site in Connecticut, testified that the foregoing statements were not true but that he wrote or made the statements while he was “under extreme duress” as he was living with his father and stepmother, who “instructed” him and “coerced and almost forced” him to write or say things “that weren’t true” in his letters or during meetings with “lawyers, social workers and counselors.” He testified that his father and stepmother regularly “prompted [him] to lie” and “propped [him] to say what they wanted [him] to say” in various letters or prior to any meeting with various professionals, and that if he did not “acquiesce and satisfy them . . . [he would] have to pay the consequences,” meaning that he would be “in big trouble” and they “could make [his] life miserable.” M.R. also testified that as a child he would refuse visits with his mother because his father and stepmother “made [him] *209 choose between [his] mother and father” — “made [him] pick sides” — and would otherwise “make [him] feel uncomfortable” and “ostracized” when he visited with his mother, causing “tension” in the family.
M.R. testified that after living with his father for approximately three years in Connecticut, he “told [his] father [he] didn’t want to live with him anymore because [his father was] ... an alcoholic” and M.R., who was only 12 or 13 years old at the time, was “so miserable” and “couldn’t handle his [father’s] behavior.” His father then permitted him to live in Vermont with a friend’s family in a house which was near a vacation home that his father owned. M.R. lived with that family for about six months, lived in his father’s Vermont home for six months with his father and stepmother and then “was placed in state custody” — “foster care” — by his father when M.R. was only 13 or 14 years old. When he turned 17 years old, he moved in with his mother in Connecticut.
Finally, M.R. testified that in 2007 the “communication” between A.R. and his mother “was increasing” and “they were sort of mending, . . . [c]oming back together and reuniting a little bit.”
At the hearing, the People sought to call as a witness Maryann Howard, the social worker who originally investigated the sexual abuse allegations on behalf of CDCFS. The court, over defendant’s objection, permitted the People to call Ms. Howard as an impeachment witness primarily because A.R. had repeatedly testified at the hearing that when he discussed the “false allegations” of sex abuse with social workers and caseworkers, he “always tried to be as vague and general as possible” since he “did not have any basis [in] truth to say anything about it.”
Ms. Howard testified that in March and April 2000, she interviewed A.R. as part of her investigation of sexual abuse claims made against defendant. According to Ms. Howard, A.R., who “presented as an anxious child,” told Ms. Howard that he was a “chronic bedwetter” and that “when he had an episode of wetting, . . . his mother . . . would be in his pants removing the padding” which “made him feel uncomfortable” because she “was touching him” and “would fondle his genitals” and “hit him on his buttocks.” When the court sought to clarify whether the “touching or the fondling of the genitals happened during the removal of the pads,” Ms. Howard answered, “sometimes during the removal of the pads, but not always.” The fondling and touching also happened at other times, such *210 as “[szc] for awakening him, at bed times, and [A.R.] further stated that there was face slapping, buttocks slapping, bear hugging — to use his term.”
Ms. Howard admitted, however, that she never indicated in her written report that A.R. used the word “fondling” when he discussed the removal of the anti-bedwetting pads or the alleged abuse. Portions of that report, admitted in evidence as People’s exhibit 1, indicate the following regarding the allegations of sexual abuse by A.R.:
“[A.R.] stated that his mother continuously bear hugged him, smacked his face, sat on his legs and spanked his buttocks to awaken him and touched his genitals continuously as he grew older. Child stated that at some point he became very uncomfortable with his mother touching him and when he got enough nerve to talk to her about how uncomfortable it made him, child stated his mother remarked that she ‘was just trying to be a good mother.’ Child stated that he was a bed wetter and wore a monitor at night to help prevent episodes. Child stated that if his mother heard the alarm go off she would come to his room and take the pad from his genitals and would not stop when he asked her to. Child admitted that he started sleeping on his stomach to avoid his mother’s inappropriate touching.”
Ms. Howard testified that she recalled her investigation, which occurred over 11 years ago, because it was the only case which she referred to “an out-of-state jurisdiction” and because it was extremely rare to investigate sexual abuse allegations where the “alleged perpetrator was a female with a birth child.”
The Court’s Findings and Conclusions
Criminal Procedure Law § 440.10 (1) (g) provides, in pertinent part, that the court may vacate a judgment when
“[n]ew evidence has been discovered since the entry of judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant.”
At a hearing on a motion pursuant to CPL 440.10, defendant has the burden of proving by a preponderance of the evidence *211 every fact essential to support the motion (see CPL 440.30 [6]; People v Tankleff, 49 AD3d 160, 180 [2d Dept 2007]).
The Court of Appeals has enunciated a multi-part test for the sufficiency of newly discovered evidence in the context of postverdict motions in People v Salemi (309 NY 208, 216 [1955]). The language in CPL 440.10 (1) (g) is essentially a restatement of the Salemi test, which requires that the newly discovered evidence be “material,” “[non]cumulative” and of such character that it “will probably change the result if a new trial is granted” (Salemi at 216). In this respect, newly discovered evidence which “merely impeach[es] or contradicat[es]” the trial evidence would be insufficient (id.). Furthermore, the newly discovered evidence “must have been discovered” some time following the trial and “must be such as could not have been discovered before the trial by the exercise of due diligence” (id.; see also People v Tankleff, 49 AD3d at 179).
Newly discovered evidence may of course come in many different forms, including that of a trial witness who recants his trial testimony (see People v Shilitano, 218 NY 161, 170 [1916] [the People’s argument that “evidence of recantation upon the part of a (trial) witness is not newly-discovered evidence ... is in error”]). The People are correct that courts have often looked upon recantation evidence with skepticism {see e.g. Shilitano at 170 [“There is no form of proof so unreliable as recanting testimony”]; People v Lawrence, 247 AD2d 635 [2d Dept 1998] [“It is well settled that there is no form of proof so unreliable as recanting testimony” (internal quotation marks omitted)]; People v Smalls, 70 AD3d 1328, 1330 [4th Dept 2010] [“It is well established that recantation evidence is inherently unreliable” (internal quotation marks omitted)]). Where the “recantation [is] true,” however, recantation evidence “may . . . destroy the basis upon which the judgment of conviction rests and . . . might be sufficient of itself to justify the granting of a new trial” (Shilitano at 170-171).
When the purported newly discovered evidence is recantation evidence, courts should consider the following factors:
“(1) the inherent believability of the substance of the recanting testimony; (2) the witness’s demeanor both at trial and at the evidentiary hearing; (3) the existence of evidence corroborating the trial testimony; (4) the reasons offered for both the trial testimony and the recantation; (5) the importance of facts established at trial as reaffirmed in the *212 recantation; and (6) the relationship between the witness and the defendant as related to the motive to lie” (People v Wong, 11 AD3d 724, 725-726 [3d Dept 2004]; see also People v Tucker, 40 AD3d 1213, 1214-1215 [3d Dept 2007]).
In addition, a recantation may “ acquire [ ] an aura of believability” where it is corroborated by “the testimony of. . . other witnesses at the [recantation] hearing” and where there is a “lack of trial evidence connecting defendant with the commission of the crime” {Wong at 726).
Here, the newly discovered evidence defendant offers is the recantation of A.R., and the additional testimony of M.R., which tends to corroborate his recantation. Applying the foregoing six-part test, the court now holds that the “recantation [is] true” and that it effectively “destroy[s] the basis upon which [defendant’s] conviction rests” {Shilitano at 170).
First, the court fully credits the “substance of [A.R.’s] recanting testimony” and the “reasons offered for both the trial testimony and the recantation” {Wong at 725-726). Indeed, the court specifically finds that his hearing testimony was “inherently] believabfie]” {id. at 725). The court carefully observed A.R. during his testimony, and is now convinced that he was telling the painful truth throughout the hearing. His testimony was honest, forthright and consistent, and his explanations were completely plausible.
Indeed, the ring of truth permeated A.R.’s testimony at every turn, especially when he painstakingly testified about why he was “coming forward” now (“[b]ecause this is a horrible thing that [he] did to [his] mother. And it’s something that for [him] to really go forward with [his] life, [he] need[s] to at least know that [he] tried to have it reversed”); why he originally made the false allegation (“to take the attention off [him]self ’ at a time when he had just returned home from a state youth shelter and to curry favor with his father who had been consistently complaining to A.R. about his mother during their divorce proceedings); why he repeated the false allegations in his trial testimony (“because at that point [he] felt like [he] had carried this lie so far that [he] needed to see it through because [he] didn’t want [his] dad to see [him] as a liar or [as] disloyal to him” or “as a traitor”); and how he first told his younger brother that the sex abuse allegations were false (he “tried to let [M.R.] know like, Hey, man. I don’t know what you know, what you don’t know, but I am telling you right now that that wasn’t true. That didn’t happen”).
*213 Second, the court finds that A.R.’s “demeanor ... at the evidentiary hearing” (Wong at 725-726) was appropriate and consistent with that of a young man who was attempting to look inward and come to grips with the extraordinary pain which he caused as an adolescent boy, who was unfortunately spurred on by his alcoholic father’s persistent, poisonous complaints about his mother. At the time of his hearing testimony, A.R. was 23 years old, married and employed at a public access television station in Bennington, Vermont. Although the court cannot make a finding as to the “demeanor” (id.) of 14-year-old A.R. when he testified at the trial, the 23-year-old A.R. impressed the court as a mature young man who, after a troubled and difficult childhood and a somewhat tumultuous teenage life, was appropriately struggling to “make the truth known for [him] and [his] family” (A.R.’s words) and to “fix things right .... [and] bring forth the truth” (M.R.’s words). A.R. appropriately recognized that in bringing the false allegations, he “was being very selfish and close-minded, and . . . did not consider [his mother’s] feelings or the implications that it would have on her life down the road.” His demeanor — his facial expressions, his eye contact, his thoughtfulness and his level of anxiety and poise — throughout the extended direct and cross-examination, as well as the pointed questioning by the court, demonstrated to this court that he was credible.
Furthermore, the “inherent believability” of A.R.’s recantation testimony “acquire[d]” an additional “aura of believability” (Wong at 725-726), when it was corroborated by the testimony of his brother, whose testimony the court also credits in all respects. M.R. testified that he shared a bedroom with his brother when they lived with their mother in Queens and that he never observed his “mother get into [A.R’s] bed at night” or “engage in any kind of sexual contact with [A.R.].” Although M.R., now 21 years old and working for a news Web site in Connecticut, candidly admitted that when he was a child he wrote and said many negative things to various professionals about his mother, including a statement which indicated that he believed that his mother “sexually abused [A.R.],” the court credits M.R.’s testimony that the foregoing statements were not true and that he wrote or made the statements while he was “under extreme duress” and while he was living with his father and stepmother, who “instructed” him and “coerced and almost forced” him to write or say things “that weren’t true,” “prompted [him] to lie” and “prepped [him] to say what they *214 wanted [him] to say” in his letters or during meetings with “lawyers, social workers and counselors.” In this respect, M.R.’s credible testimony also corroborated A.R.’s testimony that he made up the false sex abuse allegations after his stepmother and father “probed” and “prodded” him to disclose negative information about his mother — to the point where it appeared to A.R. that they were “looking for something” of which to accuse her.
In addition, the court finds that A.R. did not have a substantial motive to lie about the false allegations of sexual abuse. Aside from the satisfaction of knowing that he “tried to . . . reverse” an extraordinary injustice and tried to “make the truth known,” A.R. certainly does not gain any benefit from retaining counsel, and subjecting himself to extended and pointed questioning and the risk of a possible perjury prosecution. Nor does he gain anything from admitting under oath, publicly and in the presence of his new wife, the “embarrassing” truth that he virtually ruined his mother’s life by fabricating sex abuse charges against her.
Significantly, the People’s contention that A.R.’s recantation was motivated primarily by a desire to rebuild a relationship with his mother ignores the fact that that fragile relationship was already on the “mend” and A.R. and his mother were already “[c]oming back together and reuniting a little bit.” If he ever had a motive to lie, it was when he testified at defendant’s trial as a 14-year-old adolescent desperate to “maintain [his] relationship with [his] father and stay living with him.” He did not have a motive to lie when, as an adult, he shared with his brother that the sex abuse allegation was fabricated and when, as an adult, he admitted in court “this horrible thing that [he] did to [his] mother.”
It is true, as the People allege, that A.R. indicated in his affidavit that he testified falsely against his mother, at least in part, because he was living at a foster group home and was hoping that by testifying his father would permit him to return home. This sworn allegation in A.R.’s affidavit was contradicted by his hearing (and trial) testimony that he in fact had already returned home by the time he testified at his mother’s trial. Unlike the People, however, the court does not view this contradiction as a “huge discrepancy” which “casts doubt upon his entire recantation.” In fact, the court credits A.R.’s explanation for the discrepancy — that he was always trying to “stay living with [his father]” and that his ability to remain at home with *215 his father was always tenuous (as verified by the fact that within one or two months following the false accusation in March 2000 and the false testimony in January 2002, A.R. was again removed from his father’s home and placed into state custody in Connecticut and Vermont, respectively). Those related reasons and A.R.’s fear that his father would “see [him] as a liar or [as] disloyal to him” or “as a traitor,” were the dual reasons why he “needed to see [the lie] through” by falsely testifying at his mother’s trial.
Also, the court does not fault A.R. for failing to set forth a completely accurate chronology of his custodial arrangements while he was an adolescent — whether he was living with his father or was in state custody during certain events. It certainly does not surprise the court that he would have trouble recalling precisely where he was living as an adolescent at specified times, inasmuch as he was constantly being shifted from one state home to another and only intermittently stayed at his father’s home. Given all of the circumstances, the minor discrepancy between A.R.’s affidavit and his testimony does not weigh heavily with the court.
Nor is the court’s finding regarding A.R.’s inherent credibility altered in any way by the hearing testimony of Ms. Howard, the retired social worker. Ms. Howard was called as a witness by the People to impeach A.R.’s claim that when he discussed the “false allegations” of sex abuse with social workers and caseworkers, he “always tried to be as vague and general as possible” since he “did not have any basis [in] truth to say anything about it.” Far from impeaching A.R.’s credibility, Ms. Howard’s testimony, together with her report which was admitted into evidence, mostly corroborated A.R.’s testimony and otherwise suggested that he, in talking to Ms. Howard, had obscured the false claim of inappropriate touching, by indicating that it happened while his mother was attempting to remove his anti-bedwetting pads during “episode[s] of wetting.” Although Ms. Howard also testified that A.R. had claimed that his mother “fondled” his genitals, Ms. Howard candidly admitted that she never indicated in her written report that he used the word “fondling” when, 11 years earlier, he discussed the removal of the anti-bedwetting pads or the alleged abuse. In short, Ms. Howard’s testimony basically left the court with the impression that A.R. was indeed “as vague and general as possible” when he discussed the false allegations.
The court also disagrees with the People’s claim that there was other corroborating evidence at the trial to prove the al *216 leged sex abuse — namely, defendant’s admissions to Ms. Howard, the social worker who investigated the sex abuse claims. It is true that Ms. Howard testified at trial that defendant admitted to her that, on some unspecified date in the past, there was “an occasion when [defendant] awakened in her bed and [A.R.] was over her . . . [a]nd she reached down with her hand and touched his genitals.” Defendant later acknowledged her statement to Ms. Howard during her own trial testimony, explaining that when A.R. fell asleep with his head on her shoulder and his arms across her chest, she attempted to roll him away and accidentally touched his genitals. Given defendant’s explanation of the accidental nature of the touching, defendant’s statement to Ms. Howard is hardly an admission of wrongdoing and could not serve as credible corroboration of the sex abuse crimes allegedly occurring between September 1 and November 30, 1998.
Finally, inasmuch as A.R.’s material and noncumulative recantation casts his trial testimony as a complete lie, the People’s additional contention that A.R.’s recantation testimony “merely impeach[es] or contradict[s]” his trial testimony (People v Salemi, 309 NY at 216) is without merit. On the contrary, A.R.’s “inherently] believeab[le]” recantation testimony (People v Wong, 11 AD3d at 726), together with the “aura of believability” arising from M.R.’s corroborating testimony (id. at 726), strikes at the very heart of the People’s case and effectively “destroy[s] the basis upon which the judgment of conviction rests” (People v Shilitano, 218 NY at 170). In this respect, the recantation evidence here is wholly unlike the “partial recantation” in People v Lavrick (146 AD2d 648, 649 [2d Dept 1989]), and the merely “impeach[ing] or contradicting]” recantation in People v Cassels (260 AD2d 392, 393 [2d Dept 1999]).
Having found that the “recantation [is] true” {Shilitano at 170), the court further finds that the recantation evidence is clearly “of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant” (GPL 440.10 [1] [g]). There being no dispute that the recantation evidence was discovered after the guilty verdict or that the recantation evidence “could not have been produced by the defendant at the trial even with due diligence on [her] part” {id.), the motion to vacate the judgment of conviction is hereby granted. Here, the recantation evidence was “sufficient of itself to justify the granting of a new trial” {Shilitano at 171). Accordingly, a new trial is ordered.

. Although A.R. is now 23 years old, the court exercises its discretion to keep A.R.’s identity confidential (by using his initials) pursuant to Civil Rights Law § 50-b. Furthermore, inasmuch as disclosure of A.R.’s brother’s and father’s names would also disclose, by inference, the identity of A.R., the court will also identify A.R.’s brother as M.R. and A.R.’s father as R.R.

. Another judge of the Criminal Court presided over the bench trial in this matter. The motion to vacate was assigned to this court because that judge is no longer assigned to Criminal Court.

. Following the court’s guilty verdict, defendant moved, pursuant to CPL 330.30, to vacate the court’s verdict on the ground that the People had failed to disclose alleged Brady material — a “Child-Adolescent Psychiatric Intake” report, prepared by A.R.’s father and stepmother in February 2000, in which they twice described A.R. as a “compulsive liar” and indicated that he began lying “since he could talk.” That motion was denied.

. Defendant’s conviction was later affirmed (see People v Bronson, 5 Misc 3d 137[A], 2004 NY Slip Op 51556[U] [App Term, 2d & 11th Jud Dists 2004], lv denied 4 NY3d 884 [2005]).