OPINION OF THE COURT
Joseph A. Zayas, J.
In 1996, defendant was convicted after a jury trial of murdering Antoine Stone on a street corner in Queens. Almost 20 years after the shooting, defendant moved pursuant to Criminal Procedure Law § 440.10 (1) (b), (c), (d), (f), (g) and (h) to vacate his conviction, arguing that vacatur was warranted based upon newly discovered evidence (identification recantations), alleged Brady and Rosario violations, and the ineffective assistance of trial counsel. The People opposed the motion. The court granted defendant’s motion only to the extent of ordering a hearing to examine certain specified claims set forth in defendant’s motion.
Several days before the hearing was scheduled, defendant notified the court for the first time that he wished to call an expert on eyewitness identification and human night vision to corroborate the recantation of one of the two identifying witnesses who testified at trial, Joan Purser-Gennace.
During the pendency of the post-conviction hearing, defendant later specifically sought, in various other written submissions, to present the testimony of Dr. Scott C. Fraser regarding *796 “his results of a night crime-scene reconstruction performed under lighting conditions substantially similar to those existing on the night of the shooting of Antoine Stone.” Defendant contends that this testimony would not only “corroborate” Purser-Gennace’s recantation testimony, but that it would also “provide the Court with credible, informative testimony that will assist the Court in assessing the ‘inherent believability’ ” of her recanting testimony. Additionally, defendant now contends that Dr. Fraser’s testimony constitutes newly discovered evidence as it relates to the unreliability of Purser-Gennace’s identification of defendant at trial.
The People oppose defendant’s application arguing that it is “unnecessary, unscientific, irrelevant, invasive of the province of the trier of fact, and unreliable.” Specifically, the People argue that the proffered testimony is “not beyond the ken of the finder of fact,” and that it would “usurp the fact finder’s function and selectively and improperly bolster PurserGennace’s credibility at the hearing while simultaneously impeaching other parts of her testimony.” The People also challenge the reliability of the proffered testimony by citing United States v Herrera (788 F Supp 2d 1026, 1036 [ND Cal 2011])—a decision in which Dr. Fraser’s expert testimony was described as “an amalgam of a whiff of science mixed with unjustified extrapolation” and “a small dose of medicine in a large bottle of snake oil.” Finally, the People contend that Dr. Fraser’s testimony does not constitute newly discovered evidence.
Defendant’s application to call the purported expert requires the court to decide the propriety of admitting, at a post-conviction hearing, expert testimony on “night crime-scene reconstruction” and “human night vision,” where the trial and CPL article 440 hearing minutes are bereft of testimony establishing the actual lighting conditions that existed on the night of the shooting. Upon consideration of the submission of the parties, and for the reasons stated below, defendant’s motion to call Dr. Fraser is denied in its entirety.
It is well established that “[a] trial court may, in its discretion, admit, limit, or deny the testimony of an expert on the reliability of eyewitness identification, weighing a request to introduce such expert testimony ‘against other relevant factors, such as the centrality of the identification issue and the existence of corroborating evidence’ ” (People v Santiago, 17 NY3d 661, 668-669 [2011], citing People v Lee, 96 NY2d 157, 163 [2001]; see generally People v LeGrand, 8 NY3d 449, 452 [2007]). *797 If a court decides that “the accuracy of eyewitness identifications” is central to a case, it must then make a threshold decision assessing, inter alia, “whether the proposed ‘testimony is . . . relevant to the witness’s identification of defendant’ ” (Santiago at 669; see e.g. People v Crosdale, 103 AD3d 749, 750 [2d Dept 2013] [finding that “the court properly precluded the expert’s testimony to the extent that it related to the concept of flashbulb memory, as it was irrelevant to the issues presented by the case” (emphasis added)]).
Here, the proffered testimony that defendant wishes to present at the post-conviction hearing hinges on the results of a “reconstruction of the lighting conditions present on the night of Antione Stone’s death.” However, given the paucity of trial testimony and the total lack of post-conviction hearing testimony regarding the lighting conditions (i.e., the degree of illumination) that existed on the night of the homicide, replication of the lighting at the crime scene to assess “human night vision” is an impossible task. Because the defense failed to lay a proper foundation for expert testimony about a crime scene reconstruction as it relates to lighting and human night vision, such testimony would be irrelevant and lacking in probative value, and can in no way assist this court in assessing the reliability of Purser-Gennace’s identification testimony.
At trial, Purser-Gennace testified that the two men that she observed from her window for approximately 15 minutes were standing next to a streetlight, and that the “street was very bright and clear.” Although several other trial witnesses testified about the streetlights located in and around the crime scene, there is nothing in the trial record, from Purser-Gennace or any other witness, to establish the existence or nonexistence of additional sources of light that may have illuminated the shooter and the crime scene. Indeed, there was no testimony to establish the existence or nonexistence of lights which may or may not have been on in other areas of the multifamily, multiwindow house from where Purser-Gennace made her observations. And although the men observed by Purser-Gennace were at times facing the street, there is no testimony from her or from any other witness regarding the lights that may or may not have been reflected on the shooter’s face from the headlights of passing or idling cars, or the lights that may or may not have emanated from neighboring homes, like, for example, the nearby home of Mr. Jose Rodriguez.
Moreover, because there is a total lack of foundation in the post-conviction hearing minutes, any testimony regarding the *798 “effect of illumination at the scene on the human eye’s ability to distinguish facial characteristics,” holds no probative value. Remarkably, although defendant was well aware that he was seeking to introduce expert testimony on this issue, defense counsel failed to ask a single question of Purser-Gennace or Rodriguez about the lighting conditions on the night of the murder.
The court’s conclusion regarding the futility of the proposed crime scene replication is strengthened by Dr. Fraser’s affidavit where he admits that he could not “conduct a reconstruction,” “[d]ue to several factors, e.g. cloud cover and ground snow.” And although Dr. Fraser states that he would “conduct his reconstruction on a Friday night in order to account for the lighting given off from people’s houses,” on the theory that “more houselights tend to be lit, and tend to stay lit later into the night and on the weekend,” these efforts would amount to speculative guesswork and would never provide an accurate recreation inasmuch as no questions were ever asked of any of the witnesses about the lights emanating from nearby homes, apartments or cars. Indeed, defendant concedes this point when he writes that “Dr. Fraser cannot feasibly reconstruct conditions identical to those existing on the night of Mr. Stone’s homicide.” Thus, because it is impossible to replicate a crime scene that, at this point, can most aptly be described as a blank slate, the court exercises its discretion to preclude Dr. Fraser’s testimony, as his opinion holds no probative value and is therefore wholly unsuitable as corroborating evidence (but cf. People v Bronson, 32 Misc 3d 201, 216 [Crim Ct, Queens County 2011] [finding the recanting witness’s testimony to be “inherently) believab(le)” inasmuch as it acquired an additional “aura of believability” given the corroborating testimony from the recanting witness's brother (emphasis added)]).
The testimony from the post-conviction hearing alone also provides ample reason to deny defendant’s application. Absent from the post-conviction hearing transcripts is any indication that Purser-Gennace’s observations were impeded by distance, dim lighting or the nighttime conditions. In fact, when the court asked Purser-Gennace at the hearing if the lighting conditions were “bright and clear,” she said “yes,” which is consistent with Rodriguez’s testimony, inasmuch as he too remembered “that it was light outside.”
Moreover, at the post-conviction hearing Purser-Gennace affirmed to the court that all of her trial testimony was true, with *799 the exception of her equivocal identification of defendant as the man on the bicycle—a falsehood that she attributed to government misconduct and not to faulty perception or memory issues. Indeed, some of the selected portions of testimony cited hy defendant in support of his current application do not suggest that Purser-Gennace’s identification recantation was due to poor lighting or distance; rather Purser-Gennace on at least one occasion testified that her inability to identify defendant was because “I wasn’t paying attention like to see who those people was . . . .”
Furthermore, to the extent that Purser-Gennace also testified that she could not see the faces “real clear,” that testimony appears to be based on the fact that she did not have a prior recognition of defendant. On at least two occasions, PurserGennace said, “I couldn’t recognize real clear to know who was at the window,” and “I saw him there, but directly stare to know the face, but he has a face as a person and he was—he came back and was” (emphasis added). Accordingly, the need for an expert’s opinion about what he believes Purser-Gennace could see from her window under nighttime conditions is unnecessary as Purser-Gennace has consistently testified at the trial and at the hearing that her unimpeded observations were made on a “bright and clear” night, over a 15-to-20-minute period, and during a time in which she twice made eye contact with the man on the bicycle.
People v Morillo (35 Misc 3d 1213[A], 2011 NY Slip Op 52507[U] [Sup Ct, Bronx County 2011]), the case upon which defendant heavily relies, does not require a different result. In that case, the post-conviction hearing court allowed defendant to introduce video evidence to show what the “human eye” could see from the window that the recanting witness had heen looking out of at the time of the incident. The court found the video evidence to be material and competent inasmuch as it “established] that it would be extremely difficult for the human eye to see any facial features from the fourth floor bedroom window that [the witness] was looking out of at the time of the shooting . . . .” (Id. at *22.) Here, by contrast, and for the reasons stated above, the proffered evidence could never be competent or material owing to the numerous foundational weaknesses relating to the lighting conditions.
Relevancy and lack of probative value aside, the expert witness’s proposed testimony is also excluded because its admission would violate the rule that a party cannot impeach his own *800 witness (see Prince, Richardson on Evidence § 6-419 [Farrell 11th ed 1995], citing Becker v Koch, 104 NY 394, 401 [1887] [impeachment to prove that a witness made a prior contradictory statement is prohibited]). At the post-conviction hearing, Purser-Gennace, a witness called by defendant, testified that the distance from her window to where the men were standing was no more than 25 feet. It is evident from the written submissions, however, that Dr. Fraser intends to impeach that testimony by testifying that “line-of-sight distance from PurserGennace’s window to the spot where she saw two men standing” is greater than 25 feet. Moreover, if Dr. Fraser were permitted to testify, he would say that the nighttime lighting conditions and the distance would have made it impossible for PurserGennace to make an identification. This too, however, would impeach that portion of the hearing testimony where the defense witness stated that she made certain observations of the shooter under “bright and clear” conditions.
Although the court denied defendant’s eleventh hour oral application to introduce in evidence a 1984 map (last corrected in 1982) from the Long Island Lighting Company (LILCO)[1] to show that there was no streetlight on Purser-Gennace’s side of the street in 1994,[2] the admission of the map would not have altered the court’s finding regarding the inadmissibility of the expert testimony. Even assuming that the 1984 map accurately depicted the absence of a light post in 1994,[3] that assumed fact alone would not have overcome the foundational weaknesses underlying the request to call an expert, inasmuch as it would have merely supplied a tiny piece of the “lighting” puzzle.
Finally, defendant’s latest claim that the expert testimony constitutes newly discovered evidence and is an additional basis *801 upon which to vacate defendant’s judgment of conviction is without merit, inasmuch as defendant, although in a position to raise this ground when he first filed his motion, failed to do so (see CPL 440.30 [1] [“Upon the motion, a defendant who is in a position adequately to raise more than one ground should raise every such ground upon which he or she intends to challenge the judgment”]). Significantly, defendant failed to timely raise this issue as newly discovered evidence in his initial motion papers or in his voluminous supplemental filings, in which he sets forth an evolving theory of ineffective assistance of counsel, as well as an evolving theory of recantation. Indeed, it was not until three months after the court had issued an order granting a limited CPL 440 hearing on discrete, specified issues, that defendant first proposed to call the purported expert; and it was not until many weeks after the start of the hearing that the defendant claimed that the purported testimony is newly discovered.
In any event, the proffered testimony does not constitute newly discovered evidence as it merely contradicts and impeaches Purser-Gennace’s trial and CPL 440 hearing testimony (see People v Edwards, 65 AD3d 1374, 1375 [2d Dept 2009], citing People v Salemi, 309 NY 208 [1955]). Further, although defendant argues that some of the technology related to nighttime vision was not available in 1996, certainly there were other proposed investigatory measures, such as the measurement from the window to the place where the shooter was standing, which defendant, exercising due diligence, could have pursued at the time of his trial in 1996 (see CPL 440.10 [1] [g]). Nor is the evidence of the measurement “of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant” (id.).
For the reasons stated above, defendant’s motion to call a purported expert is denied in its entirety.

. Defense counsel’s claim that this map was the same map referenced by Detective Gerald Weiser during his trial testimony is belied by the trial record inasmuch as Detective Weiser testified that his testimony regarding lighting conditions was from the Bureau of the Gas & Electricity Division of Engineering map (not a LILCO map).

. The court denied the application on the grounds that (1) the map constituted newly discovered evidence which could have easily been discovered at the time of the trial; (2) the introduction of the map was way beyond the limited scope of the hearing which was ordered; (3) the proposed map impeached the testimony of the defense witnesses; and (4) defendant failed to file the motion upon reasonable notice to the People.

. This of course does not appear to be a safe assumption inasmuch as the LILCO map (1) does not indicate any lighting conditions in 1994; (2) appears to be different from the map relied upon by Detective Weiser at trial (see n 1); and (3) contradicts Purser-Gennace’s sworn testimony that there was a streetlight in front of her home.